**MR. X, Plaintiff,**

v.

**NEW YORK STATE EDUCATION DEPARTMENT, New York City Board of Education, and Community School District 2 in the City of New York, Defendants.**

**No. 96 Civ. 7059(CBM).**

United States District Court,
S.D. New York.

Sept. 4, 1997.

---

Tenzer Greenblatt, LLP, New York City, for Plaintiff.

Dineen McDonald, Paul Crotty, Corp. Counsel of the City of New York City, New York City, for Defendants.

## OPINION

MOTLEY, District Judge.

## BACKGROUND

On September 16, 1996, plaintiff ("Mr. X") commenced this action on behalf of his son ("E") alleging that E had been deprived of a free and appropriate education ("FAPE") which he is entitled to under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400 et seq. and New York Education Law. After plaintiff applied to defendant Community School District 2 ("School District") for educational services for E, the School District's Committee on Pre–School Special Education ("CPSE") developed an Individualized Education Plan ("IEP") for E, which plaintiff rejected. Pursuant to IDEA, plaintiff demanded an impartial hearing on the IEP. The Impartial Hearing Officer ("HRO") determined that the CPSE had recommended a FAPE as required by law. Plaintiff appealed the decision to the State Review Officer ("SRO") who dismissed the appeal. This action followed challenging these decisions.

On November 21, 1996, defendant New York State Education Department ("SED") filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6). On November 27, 1996, New York City Board of Education and School District (collectively, "City defendants") filed an answer. On January 7, 1997, plaintiff filed a cross-motion for summary judgment and an opposition to SED's motion to dismiss. On the same day, City defendants moved for leave to amend their answer to assert a cross-claim against SED. On February 18, 1997, City defendants filed a cross-motion for summary judgment against plaintiff. On April 8, 1997, SED and City defendants submitted a stipulation, which was so ordered by this court, stating that SED would not oppose City defendants' application to amend their answer and that SED could move to dismiss any cross-claims asserted against it by City defendants if any claims against any defendants survived this court's disposition of the pending motions to dismiss and for summary judgment. Parties were notified by stipulations so ordered by this court and dated January 2, 1997 and February 14, 1997 that any motions or cross-motions would be taken on submission.

## FACTS

The facts as alleged in the complaint are as follows: E was born on August 9, 1991. Since March, 1994, E has been receiving, at the expense of his parents, remediation for his autistic symptoms in a home based program which incorporates discrete trial instructions using Applied Behavioral Analysis ("ABA").[1] ABA has been recognized as the only method with any real success in the remediation of autistic symptoms. Discrete trial instruction using ABA is conducted by paraprofessionals on a one-to-one basis under skilled supervision. Remediation requires intensive formal instruction by paraprofessionals and is supplemented by continuous incidental teaching by parents and care givers. Autistic children, including E, often lack motivation to learn new tasks, participate in social environments, and utilize important cues set before them in an educational setting. E's home based program was conducted 40 hours a week by three parapro-

---

1. ABA therapy is a form of treatment for autistic preschoolers that was developed by Dr. Ivar Lovaas at the Princeton Child Development Institute and consists of breaking down activities into discrete individual tasks and rewarding the child's accomplishment. The child eventually learns to integrate the information and associate instruction with a given activity. *see, Malkentzos v. DeBuono,* 923 F.Supp. 505, 509 (S.D.N.Y. 1996), *remanded on other grounds,* 102 F.3d 50 (2d Cir.1996).

fessionals, who were supervised by a professional trained in ABA and who spent two to three hours with E improving his motivation and ability to recognize environmental cues, and was supplemented by instruction from his parents. E's ABA instruction was also supplemented with mainstream activities with children without disabilities, particularly two music classes and a mother/child play group several days a week.

On January 18, 1994, two months before plaintiff began E's home based ABA program, plaintiff applied to the School district for public preschool educational services for E, services E would become eligible for on July 1, 1994. Thereafter, E was evaluated and his educational needs were assessed by a multi-disciplined team of experts who plaintiff alleges determined that E should continue in the home based program. Plaintiff alleges that in fall, 1994, CPSE forwarded E's evaluation report to several privately owned nursery schools, including the Association in Manhattan for Autistic Children ("AMAC"), and asked each to indicate whether it thought it could provide an appropriate education for E. Each school, except AMAC, allegedly informed CPSE that they had no vacancies. Plaintiff also claims that although CPSE had not yet formulated an IEP for E, a Board of Education representative on the CPSE informed him that the CPSE would be recommending E to AMAC.

On January 23, 1995, a year after plaintiff applied for educational services and six months after E was eligible for such services, at a meeting in which plaintiff was present, CPSE allegedly recommended that E be placed in AMAC, formulated short term goals and objectives some of which where ultimately deleted following plaintiff's contention that E had already met those objectives, and provided 25 hours of ABA instruction per week. When informed by plaintiff that AMAC did not have a one-to-one aide for E to administer ABA instruction, CPSE allegedly made the availability of one-to-one ABA instruction for E subject to SED's approval of Board funding to hire such an aide. Additionally, plaintiff alleges that CPSE revised the draft IEP to conform to AMAC's resources once it was informed by AMAC's

director that AMAC could not fulfill certain requirements in the draft IEP.

Plaintiff alleges that CPSE's recommendations in the IEP were arbitrary and capricious and contrary to federal and state laws. Plaintiff claims that AMAC consists only of children with various disabilities including some that are autistic and argues that the law requires CPSE to avoid separating children with disabilities from children without disabilities. Plaintiff maintains that placing E, an autistic infant, in AMAC would harm his development and that the IEP, suggesting said placement, was in violation of the law since it was not based on the needs of E but on the resources of the educational institution. Lastly, plaintiff claims that at the meeting, CPSE failed to provide him with an explanation as to why it recommended a program contrary to that preferred by him and the specialists, i.e., the home based program, and that four months after the meeting, CPSE erroneously informed him by letter that the home based program he requested did not fall within the confines of available services provided by the State Education Regulations.

On February 22, 1995, plaintiff rejected the IEP and the AMAC placement and demanded an impartial hearing. Plaintiff claims that CPSE failed to meet its burden of proving that its recommendations were appropriate by not offering any written reports, evaluations, or recommendations other than those previously furnished by plaintiff. Plaintiff alleges that CPSE's principal witness, Frederica Blausten ("Blausten"), AMAC's executive director, admitted that she had not interviewed E, personally, but that a staff psychiatrist had, although neither he nor his report were submitted into evidence at the hearing. Blausten also allegedly testified that AMAC could only provide intermittently 25 hours of education to E on a one-to-one basis. Moreover, plaintiff claims that the Board submitted no evidence showing that the State Education Department had approved the Board's funding for the one-to-one aide mentioned in the IEP.

On March 29, 1996, although the HRO acknowledged that E had made remarkable progress in his home based program to the

credit of his parents and that CPSE had erroneously concluded that home based programs were not authorized under state regulations, the HRO determined that City defendants had recommended a FAPE for E. The HRO found that the IEP was not inappropriate because some of the short term objectives and goals set for E had already been achieved by him since they could easily be modified to suit his actual skill level when he entered the program; that plaintiff failed to show that the home based program was more appropriate or a less restrictive environment than the center based program; and that there was no evidence establishing that ABA could not be implemented intermittently to E in a class with seven children or that it had to be implemented 40 hours a week to be effective and not 25.

Plaintiff appealed the decision of the HRO to a SRO claiming that the HRO's decision was arbitrary and capricious due to her misconstruing of the law in holding that segregated education of disabled children is not the most restrictive environment and in determining that the short term objectives were appropriate because they could be modified. Plaintiff maintained that the HRO erroneously shifted the burden from the City defendants to prove the appropriateness of their recommended placement and erroneously determined that plaintiff was partially responsible for the delay in the formulation of the IEP.

On July 26, 1996, the SRO dismissed plaintiffs appeal despite her finding that CPSE failed to comply with state law by not providing Mr. X, at the time of its recommendation, with a reason for its recommendation of a program other than that preferred by the parent. Plaintiff claims that both the HRO and SRO ignored the fact that the IEP conditioned the ABA one-to-one instruction on State approval of Board funding for the additional staff member at AMAC. Furthermore, plaintiff maintains that although the SRO found that the HRO erred in ruling that the IEP was appropriate because the short term objectives could be modified, the SRO also

misconstrued the IDEA mandate against placement of a child with a disability in a classroom with other children with disabilities. Plaintiff alleges that since defendants failed to provide a FAPE to E, they should reimburse him $88,000.00, the sum of the expenses incurred in providing such education. He also seeks attorney's fees and punitive damages in the amount of $250,-000.00.[2]

## DISCUSSION

### A. Motion to Dismiss

A court may grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994)(quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). Although a court must take "as true the facts alleged in the complaint and [draw] all reasonable inferences in the plaintiff's favor," *Jackson National Life Insurance Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994), a complaint that consists of nothing more than bald assertions and claims with no facts upon which a court could find a violation fails to state a claim under Rule 12(b)(6). *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir.1994).

### 1. SED's Argument

In this case, SED moves to dismiss arguing that it is not a proper defendant in this action challenging the decision of the SRO because the Commissioner of SED no longer acts as the SRO in administrative appeals under IDEA. SED also argues that plaintiff fails to allege in his complaint any wrong doing by SED. In reply, plaintiff asserts that the 1990 amendment of the State Education Law removing the Commissioner and creating a separate and neutral SRO does not exonerate SED from liability for failure to comply with IDEA mandates. Plaintiff contends that although the SRO is required under the IDEA to be impartial and

---

**2.** The court will consider plaintiffs request for reimbursement, attorney's fees, and punitive damages after a decision on the motions to dismiss and for summary judgments has been rendered.

neutral, the SRO is still a state official who acted on behalf of the state when she denied plaintiff's appeal from the HRO's decision. Plaintiff also maintains that there were numerous due process violations during the review process which implicate the policies and liabilities of SED. Furthermore, plaintiff argues that SED is liable because it is ultimately responsible under IDEA and state law for approving all programs and evaluations.

### 2. 20 U.S.C. § 1415

In the complaint, plaintiff invokes this court's jurisdiction pursuant to 20 U.S.C. § 1415.[3] In accordance with this section, this case is an administrative appeal of the findings and decisions of the SRO in regards to the IEP formulated for plaintiff's son. The court has found no case law that directly states that a SRO decision denying plaintiff's appeal subjects SED to the jurisdiction of this court pursuant to this section. This court finds, however, that given the related case law, legislative history of IDEA, and implementing federal and state regulations,

SED is subject to this court's jurisdiction and is a proper party in this action.

IDEA, 20 U.S.C. §§ 1400–1485, is a comprehensive statute that was enacted by Congress to address the problems and financial burdens placed upon the states and localities in educating handicapped children.[4] *Quackenbush v. Johnson City School District,* 716 F.2d 141, 145 (2d Cir.1983). To accomplish this ambitious goal, IDEA provides federal funding to state and local educational agencies that undertake to implement the substantive and procedural requirements of the Act. *School Committee of Town of Burlington, Massachusetts v. Department of Ed. of Commonwealth of Massachusetts,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). Federal funding is conditioned upon a state's implementation of a policy, reflected in a state plan, that assures all handicapped children the right to a "FAPE." [5] 20 U.S.C. § 1412(1); *Board of Education of Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 181, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). Such an education must be tailored to meet the unique needs of the individual child which is accomplished by the formulation of an IEP.[6] *Karl v. Board of*

---

**3.** The relevant sections are as follows:

The parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.

20 U.S.C. § 1415(b)(2).

If the hearing required in paragraph (2) of subsection (b) of this section is conducted by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

*Id.* at (c).

Any party aggrieved by the findings and decision made under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to [1415], which action may be brought in any State court ... or in a district court of the United States without regard to the amount in controversy.

*Id.* at (e)(2).

**4.** Congress originally enacted the Education of the Handicapped Act which in 1990 was renamed to IDEA.

**5.** IDEA defines a FAPE as follows:

"[F]ree appropriate public education" means *special education* and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards the [SED], (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18) (emphasis added).

IDEA defines a "special education" as follows:

"special education" means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction and instruction in hospitals and institutions.

*Id.* at (a)(16)

**6.** An IEP is a written statement for each handicapped child developed by the local educational agency, teachers, and parents and must include,

*Education of Geneseo Central School District,* 736 F.2d 873, 876 (2d Cir.1984). The IEP is "the modus operandi of the Act [and] ... is in brief a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *School Comm. of Town of Burlington,* 471 U.S. at 368, 105 S.Ct. at 2002.

To qualify for federal funding, states must not only develop a state plan and IEP but must also meet the extensive procedural safeguards required by the Act in § 1415. Section 1415 has been described as a "bill of rights for parents." *J.G. v. Board of Education of Rochester City School District,* 830 F.2d 444, 445 (2d Cir.1987); *Vander Malle v. Ambach,* 673 F.2d 49, 52 (2d Cir.1982). In accordance with § 1415(b)(2), parents must be permitted to bring a complaint about the IEP before a hearing officer whose professional and personal interest due not conflict with his or her ability to make an impartial decision.[7] *see supra* footnote 1; 34 C.F.R. §§ 300.506–507. States may implement either a single or multi-tiered level of review and if the initial hearing takes place at the local level, parents may appeal to the state educational agency. § 1415(c); 34 C.F.R. § 300.510. At the end of the administrative review process, any party may bring a civil action in state court or federal district court. § 1415(e)(2); 34 C.F.R. § 300.511.

Pursuant to IDEA, New York has adopted a plan which places the responsibility of deciding whether a child is "handicapped" and of developing an IEP on the local educational agency, i.e., the City Board. N.Y.Educ.Law §§ 4201–13,4351–58, 4401–09 (McKinney 1981 & Supp.1992). The Board in turn appoints a Committee on Special Education who develops the IEP. N.Y.Educ.Law § 4402(1)(b)(1). New York has a multi-tiered system of review of IEPs. The initial hearing is conducted before a HRO appointed by the Board from a list of state-certified officers. *see also, Heldman v. Sobol,* 962 F.2d 148, 152 (2d Cir.1992). Prior to the 1990 Amendment, parties appealed to the Commissioner of Education for review of the HRO decision; however, parties now appeal to a neutral SRO.[8] *see,* N.Y.Educ.Law § 4404(2).

Prior to the amendment, when the Commissioner served as SRO, a parent could bring a civil action in federal court against the Commissioner and therefore, SED,[9] because the parent was "aggrieved" by Commissioner's decision. 20 U.S.C. § 1415(c); *Mavis v. Sobol,* 839 F.Supp. 968 (N.D.N.Y. 1994) (Because prior to the effective date of the Amendment, Commissioner remained the statutorily designated SRO and made a decision, in that capacity, which "aggrieved" plaintiff, Commissioner was a proper party in the action); *Robert D. v. Sobel,* 688 F.Supp. 861 (S.D.N.Y.1988); *Antkowiak v. Ambach, as Commissioner of New York State Edu-*

among other things, a statement of the child's present level of educational performance, statement of annual goals, including short-term instructional objectives, a statement of specific educational services and the extent to which the child will engage in regular educational services, and the projected date for initiation and anticipated duration of such services. 20 U.S.C. § 1401(a)(19); 34 C.F.R. § 300.344.

7. As noted above, § 1415(b)(2) prohibits an employee of a state or local educational agency involved in the education of disabled children from serving as the hearing officer. In *Holmes v. Sobol,* 690 F.Supp. 154, 161 (W.D.N.Y.1988), the court concluded that the Commissioner was an employee of SED and, in serving as a hearing officer under this section, most likely violated plaintiffs procedural due process rights under IDEA.

8. In *Burr v. Ambach,* 863 F.2d 1071 (2d Cir. 1988) the Second Circuit concluded that the Commissioner, serving as SRO pursuant to 1415(c), was improper because the statute required appeals to the state level to be impartial and Commissioner was not impartial due to his extensive responsibilities and integral involvement with the operation of state-supported schools. *Id.* at 1077; *see also, Heldman v. Sobol,* 962 F.2d 148 (2d Cir.1992) ("IDEA ... prohibits the use of biased adjudicators").

9. A suit against the Commissioner in his or her official capacity generally represents "another way of pleading an action against an entity of which an officer is an agent." *Brandon v. Holt,* 469 U.S. 464, 471–72 and n. 21, 105 S.Ct. 873, 877–78 and n. 21, 83 L.Ed.2d 878 (1985) (quoting *Monell v.Department of Social Services of City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)).

*cation Department,* 838 F.2d 635 (2d Cir. 1988). In this case, this court finds little logic in defendant SED's argument that it is not a proper party in this action because the Commissioner is no longer a part of the administrative or judicial review process of IEPs.

All of the cases cited by SED show why the Commissioner and therefore, SED, are not proper parties in an action brought pursuant to 1415(c) on the grounds that the Commissioner no longer acts as SRO, but none address the issue as to whether an SRO decision (like that of the Commissioner who once acted in his or her official capacity as SRO) represents that of SED and, therefore, subjects SED to actions of this type. In *Jose P. v. Ambach,* 669 F.2d 865 (2d Cir.1982), the court held that the *Commissioner* could be held liable for general supervisory violations in an action brought pursuant to *§ 1412(6)* [10] of IDEA for failing to "enforce federal and state laws and to provide adequate general supervision over the New York City School system [and to] ensure compliance with [his] orders." *Id.* at 871. In *Dorian G. v. Sobol,* 1994 WL 876707 (E.D.N.Y.), the court distinguished *Jose P.* on the grounds that *Jose P.* was a class action against the Commissioner alleging procedural and systematic violations of federal and state law brought under § 1412(6) and not an administrative appeal under 20 U.S.C. § 1415 like the matter that was before it.

The court dismissed the Commissioner and rejected plaintiff's attempt to apply the reasoning of *Jose P.* that the Commissioner could be liable for failing to supervise local school districts and enforce federal and state laws. *see also, Bruschini v. Board of Education, et al.,* 1995 WL 807107 (S.D.N.Y.)(Commissioner and hence, SED, dismissed because court found State not lia-

ble for HRO's decisions and because there was no allegation of SRO procedural due process violations).[11] Similarly and closest to SED's argument in this case is *Yamen v. Board of Education of the Arlington Central School District,* 909 F.Supp. 207 (S.D.N.Y. 1996).

In *Yamen,* the court concluded that since the Commissioner was no longer involved in the administrative appeal process and since the complaint contained no allegations of wrongdoing or systematic and procedural deficiencies on the part of the State, the Commissioner and, hence, SED were dismissed from plaintiff's § 1415 action. In following the logic of *Dorian G.* and *Jose P.,* the court rejected plaintiff's argument that the SRO's decision, written on State letterhead, was sufficient to put the Commissioner and SED on notice that plaintiff's child had been denied a FAPE.

This court notes, however, that although the SRO's decision may not be sufficient to put the Commissioner and SED on notice of any procedural deficiencies, SED is responsible and subject to liability for the SRO's determination. If the Commissioner acting as SRO in making a decision regarding an IEP once subjected SED to a judicial proceeding reviewing such a decision, it seems only logical that the SRO, appointed by SED to make the same determinations, subjects SED to this court's jurisdiction pursuant to 20 U.S.C. § 1415(c). The parent does not stop being "aggrieved" by the "final decision" of an administrative review because an SRO, rather than the Commissioner, now makes the decision. Although the court is not deciding, in this case, on whether the SRO is an official of SED, who if sued in his or her official capacity would subject SED to liability, the court finds that the SRO decision,

---

**10.** IDEA reads in relevant part; "the State educational agency shall be responsible for assuring that all the requirements of this subchapter are carried out." 20 U.S.C. § 1412(6).

**11.** *but see, Bruschini v. Board of Education of Arlington Central School District,* 911 F.Supp. 104, 107 (S.D.N.Y.1995) (Court later acknowledged "the statute, 20 U.S.C. § 1415 grants [district court's] appellate jurisdiction over the decisions of the *state educational agency* in IDEA actions")(emphasis added). This later decision

supports this courts finding that the earlier case, as well as the other cases cited by defendant, only consider the issue of whether SED can be reached through the Commissioner's action or inaction in suits brought pursuant to 20 U.S.C. § 1415 despite the Amendment removing the Commissioner as SRO. They do not consider, unlike the *Bruschini* case cited above, whether SED can be held responsible for a decision determined by the SRO.

here, was on behalf of SED which is sufficient to subject SED to this court's jurisdiction pursuant to 20 U.S.C. § 1415. Shedding more supportive weight to this court's finding is the federal implementing regulation which specifically states in an explanatory note to § 1415(c) that "the [SED] may conduct its review either directly or through another State agency acting *on its behalf* However, the [SED] *remains responsible for the final decision on review.*" 34 C.F.R. 300.510 n. 1 (emphasis added).

Moreover, in *Rowley*, a case in which the Supreme Court discussed the responsibilities imposed on state educational agencies under IDEA, the Court established a two-step process court's are to follow in actions brought pursuant to 1415(e)(2). The Supreme Court stated that the reviewing court must first decide whether the state has complied with the procedural requirements of the Act and then must determine whether the IEP "is reasonably calculated to enable the child to receive educational benefit." 458 U.S. at 207, 102 S.Ct. at 3051; *see also, Karl,* 736 F.2d at 876. The Court noted that "this inquiry will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an IEP for the child in question which conforms with the requirements of [the Act]."[12] *Rowley,* 458 U.S. at 207 n. 27, 102 S.Ct. at 3051 n. 27. The Second Circuit has acknowledged that the sole purpose of the court's substantive review of the IEP mandated by *Rowley* is to ensure that disabled children are not denied access to their state's educational system. *Karl,* 736 F.2d at 876. In the matter before the court, since SED "remains responsible for the final decision on review," the court finds that SED is a proper defendant in this action considering whether plaintiff's son was denied access to a beneficial state education due to the SRO's denial of plaintiff's appeal. The court now turns to the merits of plaintiff's action challenging the adequacy of his son's IEP.[13]

## B. Summary Judgment Standard

 In this case, plaintiff moves for summary judgment against SED and City defendants and City defendants cross move for summary judgment. When a party moves for summary judgment in an IDEA action, the court does not make the traditional inquiry into whether there are disputed material issues of fact, but rather, whether the administrative record and any additional evidence shows that there has been compliance with IDEA's procedure and that the IEP has addressed the child's educational needs. *Wall v. Mattituck–Cutchogue School District,* 945 F.Supp. 501, 508 (E.D.N.Y. 1996); *see, Briggs,* 882 F.2d at 693. The Second Circuit has not decided on the issue of who bares the burden of proof in administrative appeals and the courts in this Circuit are split on the issue. *See, Evans v. Board of Education of Rhinebeck Central School District,* 930 F.Supp. 83, 93 (S.D.N.Y.1996) (party challenging administrative determination bears burden of proof); *Wall,* 945 F.Supp. at 509–11 (burden of proving the adequacy of an IEP lies with the school district); *Hiller v. Board of Education of Brunswick Central School District,* 743 F.Supp. 958, 967 (N.D.N.Y.1990) (party challenging administrative findings bears burden of proof in district court). Regardless of who bears the burden of proof, 20 U.S.C. § 1415 ultimately requires a trial court to make an independent determination on the adequacy of the IEP

**12.** The court notes that the term "state" in *Rowley* is understood to include local educational agencies which is evidenced by the numerous IDEA actions brought in federal court against local school districts and boards of education pursuant to § 1415.

**13.** Although plaintiff alleges in the complaint that the SRO violated his procedural due process rights in conducting the administrative review, the court finds that these allegations are unsupported by facts, are naked assertions, and are not a sufficient basis to subject SED to this action.

*Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) (complaints containing only conclusory, vague, or general allegations cannot survive a motion to dismiss). Hence, the court finds that there are no alleged facts sufficient to show that the State has not met the demands of the first prong of *Rowley.* The court will, therefore, move to the second prong which requires this court to consider the adequacy of the IEP. *see also, Briggs v. Board of Education of the State of Connecticut,* 882 F.2d 688, 691 (2d Cir.1989).

developed for the child based on a "preponderance of the evidence."[14] *See, Briggs,* 882 F.2d at 692; *Mrs. B. v. Milford Board of Education,* 103 F.3d 1114, 1120 (2d Cir.1997); *Rowley,* 458 U.S. at 205, 102 S.Ct. at 3050 (courts are to make independent decisions based on a preponderance of the evidence).

■ A court's authority to review state administrative decisions regarding special education is limited, however, because courts are required to give "due weight" to state administrative proceedings. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051; *Briggs,* 882 F.2d at 693 ("deference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped"). Reviewing courts are to avoid imposing their view of preferable educational methods upon the states because the "preponderance of the evidence" provision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Karl,* 736 F.2d at 876–877 (quoting *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051). Although the Act does not permit a court to "impose a particular substantive educational standard on the state or to require equality of opportunity for the handicapped education," *Mrs. B.,* 103 F.3d at 1120 (quoting *Karl,* 736 F.2d at 876), the court must establish whether the state IEP was reasonably calculated to render some meaningful benefit. *see, Rowley,* 458 U.S. at 192, 102 S.Ct. at 3043–44; *Quackenbush v. Johnson City School District,* 716 F.2d at 146 ("apparently Congress intended the court to have a significant role in achieving the substantive goals of the statute").

■ In light of these standards, the court has reviewed the administrative record together with additional evidence in the matter now before it and has made an independent judgment based on a preponderance of evidence, giving due weight to the administrative proceedings. The court finds that the educational program offered by SED and the City defendants in the IEP is not within the meaning of IDEA.

### 1. Underlying Facts

Plaintiff has raised in his motion for summary judgment a number of reasons establishing that the IEP is inappropriate. Specifically, plaintiff contends that the IEP is directly contrary to his and professional expert evaluations and recommendations on an appropriate education for plaintiffs son, i.e., continued intensive ABA instruction 40 hours a week, preferably in the home-based program in which plaintiff's son was then involved. Plaintiff also contends that ABA with a one-to-one instructor for 25 hours a week was not guaranteed to plaintiff's autistic child and was conditioned upon SED funding; that the 25 hour ABA instruction was not continuous or intensive and was not proven to be appropriate; that the short term goals specified were arbitrary; and lastly, that the placement of plaintiff's son into a classroom with children with other disabilities, including autism, was contrary to federal and state law.

The court agrees with plaintiff's contentions regarding the IEP and finds it difficult to comprehend, given the record, that the HRO and SRO could determine that the IEP provided an education program from which plaintiff's son could derive an "educational benefit." This court now reviews in detail the record in this case. According to the record, just prior to E turning two, Mr. X and his wife began to notice that E used only five words despite his appearance of a normal physical development. (R. 00198).[15] When E lost two of the five words by December, 1994, upon the advice and referral of E's pediatrician, Mr. X took E to be evaluated by Dr. Robin B. Persky, a licensed clinical psychologist, who informed plaintiff of his right

---

**14.** IDEA reads in relevant part; "In any action brought under [§ 1415(e)(2)] the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

**15.** "R" refers to the administrative record submitted as evidence by plaintiff and includes, among other things, the transcript of the hearing before the HR and the HRO and SRO decisions. City defendants submitted no additional evidence.

to apply to the CPSE in his local school district. In her evaluation dated January 18, 1994 and February 1, 1994, Persky noted that E was "language delayed ... in both expressive and receptive language skills" and recommended that he "attend a specialized nursery school program for children with language and communication disorders ... [and] receive intensive speech and language therapy, at least on a twice weekly basis." (Ex. 19).

On January 18, 1994, plaintiff wrote to Alan Rosenblum, School District Administrator, requesting that his son be evaluated by the CPSE. (Ex. B). CPSE then sent out an evaluation package to Mr. X which included a list of private evaluation sites where parents may take their child for evaluation. (R. 00024). By letter dated February 9, 1994, plaintiff requested Parkside School as an evaluation site. (Ex. 13). Nancy Hirsch, a social worker at Parkside, began the evaluation process by meeting with Mr. X and asking Mr. X to bring any evaluations he had on E. (R. 00248). Mr. X brought the Persky psychological evaluation and was informed that the evaluation was sufficient, hence, Parkside would not need to conduct its own psychological evaluation of E. In her social history evaluation, Hirsch noted that Mr. X's wife and E had just begun attending Tomorrow's Learning Center utilizing applied behavior management techniques, that Mr. X was seeking to develop a home based program using these techniques, and that E attended two music classes, a mother/child play group, and speech therapy weekly. Hirsch recommended a "special language based preschool program providing individualized attention." (Ex. C, E).

Dr. Irving Fish at New York Hospital, conducted a neurological evaluation of E on February 15, 1994 and wrote an evaluation dated March 15, 1994, diagnosing E with a "pervasive communication disorder," noting that E was involved and improving in his home based ABA program, and recommending "education ... a therapeutic nursery ... [and] speech therapy." (Ex. 7). On March 15, 1994, Dr. Steven Blaustein, conducted a speech and language evaluation of E, noted Dr. Fish's diagnosis, concluded that E was

"experiencing a severe language disorder," and recommended that E's "involvement in an applied behavioral therapeutic approach be continued and significantly expanded" because E was showing progress in eye contact and language and because such combined language and behavioral programs as E's had been "shown to be extremely effective in language disorders." (Ex. D). Lastly, as a result of an observation of E on April 8, 1994, Albina Miller, Administrative Director/Evaluator of Parkside, concluded that E "exhibits significant language and communication skills." She, therefore, recommended that E attend a language based preschool to develop communication and social skills and continue behavioral intervention due to his improvement in his home program. (Ex. 5).

On May 5, 1994, CPSE conducted an IEP review and present were Rosenblum, Miller, Mr. X, and Marie Perkins, a parent member of CPSE. (R. 00031). Prior to the meeting, CPSE considered the Blasting and Hirsch evaluations and discredited the Persky psychological evaluation due to the testing techniques Persky used on E in conducting her evaluation. (R. 00031–32). CPSE declined to make an educational recommendation noting that it had not received the Fish evaluation, medical reports, and other needed evaluations. Rosenblum wrote to Miller on May 10, 1994 requesting medical reports, another psychological report, an evaluation from Tomorrow's Learning Center and the other programs E was involved in, including the home based therapy program, and a clarification as to what the appropriate educational setting was for E since Persky and Hirsch recommended a language and communication based program while Blaustein and Miller recommended the continuation and extension of a behavioral program like the one in which E was already involved. (Ex. 21).

To clarify, Miller wrote to Rosenblum on June 13, 1994 and concluded that "Nancy Hirsch, Dr. Steve Blaustein and myself [feel that E] should continue in the behavioral program that he is currently enrolled. [sic] A center based program was also recommended by Nancy Hirsch, Dr. Persky and myself since a behavioral program is not an approved State funded program." (Ex. F). In

a psychiatric evaluation dated July 21, 1994, Dr. Richard Perry noted that due to E's slow acquisition of language early on, several evaluations were done in early, 1994 and therapy was recommended based on the diagnosis of communication difficulties. (Ex. G). Perry diagnosed E with an autistic disorder [16] and stated that "it is essential that E continue to be provided with the intensive [ABA] Program that he is now engaged in ... [ABA] is extremely labor intensive and must be continuous throughout the day." (Ex. G).

In a new psychological and behavioral evaluation dated September 23 and October 23, 1994, Dr. Ira Cohen, Head of the New York State Institute for Basic Research into Developmental Disabilities, confirmed Perry's diagnosis of autism, and similarly recommended "intensive, [ABA] ... carried out for a minimum of 40 hours/week with a 1:1 ratio of staff to Eric. Staff should be well versed in the practice of applied behavior analysis and modification for persons with autism. Specific social skills to be acquired using a discrete trials approach as well as incidental learning." (Ex. H). In a neuropsychological evaluation dated October 24, 1994, two post-doctoral interns and Dr. Cohen concluded again that E was autistic and should continue in the "intensive and language and behavioral program in which he is involved." (Ex. H). Lastly, in a letter dated December 8, 1994, Judith Palazzo of Tomorrow Learning Center, who was supervising E's home based ABA program, recommended "[E] needs exposure to learning in a group environment with peers without handicaps" and noted that "children with autism need to be taught to participate in group settings. Children ready for inclusion setting exposure must possess enough receptive and expressive language skills to function in a group and be void of behaviors which would interfere with the group." (Ex. A).

On January 23, 1995, CPSE met at AMAC and formulated E's IEP, based on all of the evaluations cited above, including medical re-

ports by Dr. Brown and Dr. Brooks dated August 17, 1994. Present were Rosenblum, Perkins, Mr. X, Miller, and Blausten. (R. 00036–37). At the meeting, Mr. X described and requested the continuance of E's home based ABA program which he began for E in March, 1994 at a time when E was not yet eligible for preschool services (E became eligible in July, 1994) and would soon become ineligible for state provided early intervention programs for disabled children up to 3 years of age. (R. 00038, 205–206).

The CPSE formulated an IEP that recommended AMAC, a center based program, five hours a day, five days a week, with a one-to-one aide and related services of speech and language in a group of one, twice a week, and speech and language in a group of five three times a week. (R. 00038–40). The IEP states that E required a small structured language based program with "behavior management strategies and group interaction ... using intensive ABA in the entire school day with a 1:1 aide for [E]." (Ex. L). Prior to 1992, AMAC did not service primarily autistic children or provide an educational setting but provided after school and Saturday programs for preschool children who were mentally ill children. (R. 00133). As a therapeutic nursery, AMAC enrolls not only autistic children but also probative developmentally delayed children in need of special education. (R. 00102–103). There is a maximum of seven in a class with a class ratio of 7:1:1, which is a group of seven with a teacher and an assistant, and the children are divided in groups based on their ability to relate and behavioral function. (R. 00099–101). AMAC offers related services of speech therapy, cooking, music, physical education, and parent training. (R. 00107–09, 114–15).

On February 22, 1995, Mr. X wrote to Rosenblum to inform CPSE that he rejected the IEP and requested an impartial hearing if E was not provided the 40 hours of ABA using discrete trial instruction via home placement and reimbursements for expenses

---

**16.** In the New York regulations, autistic student is defined as a "student who manifests a behaviorally defined syndrome which occurs in children of all levels of intelligence. The essential features are typically manifested prior to thirty (30) months of age and include severe distur-

bances of developmental rate and/or sequences of responses to sensory stimuli of speech, of language, of cognitive capacities and of the ability to relate to people, events and objects." 8 NYCRR 200.1(mm)(1); (R. 00200).

incurred thus far. (Ex. M). On May 9, 1995, Rosenblum sent a letter to Mr. X stating that the home based services he requested were not considered to be within the confines of available services pursuant to state education regulations. (Ex. 4). An impartial hearing was held on October 17, 1995, November 16, 1995, December 19, 1995 and January 5, 1996. The HRO, Allison Berry, directed the Board to proceed with its case since it bore the burden of proving that its recommendation for E was appropriate. (R. 00010). Rosenblum, the Board's first witness, testified that the CPSE based its recommendation on the Persky, Fish, Hirsch and April 8th Parkside evaluations recommending a preschool nursery that provided speech and language therapy, on the fact that E's home based program was understood to not be approved by state regulations, and lastly, on Blaustein's assurances that AMAC had a "wonderful" class for E. (R. 00047–49, 55, 74).

On March 29, 1996, Berry found that the CPSE recommended a FAPE for Eric in the least restrictive environment and found that plaintiff failed to prove the appropriateness of his home based program and failed to show that it was least restrictive. (R. 00286–315). On July 26, 1996, the SRO, Ann Eldridge, affirmed the HRO's decision, finding that AMAC was a less restrictive environment than E's home based program and that the 25 hours per week at AMAC would provide E with an educational benefit (R. 00317–327).

### 2. Educational Benefit

■ If the conclusions of the hearing and review officers are "unsupported by the record as a whole and incorrect as a matter of law, they simply [do] not merit deference." *Evans,* 930 F.Supp. at 102 (citing *P.J. v. State of Connecticut,* 788 F.Supp. 673, 679 (D.Conn.1992)). As noted above, the court finds that neither the record nor applicable law supports the hearing and reviewing officers' decisions that E was provided a FAPE. At the hearing, although Rosenblum testified

that the CPSE recommendation of AMAC as a placement was primarily based on the Persky, Hirsch, and April 8th Parkside evaluations, he also testified that the CPSE declined to make a IEP determination at its initial CPSE meeting held on May 4, 1994 based on these evaluations alone due to the conflicting recommendations, i.e., Hirsch, Parkside, and Blaustein, and because the Persky evaluation was not sufficient and an inappropriate basis for making an educational recommendation. (R. 00031–32, 47–55).

At CPSE's request, Miller submitted another evaluation on June 13, 1994 on behalf of Parkside in an effort to clarify the conflict noted by Rosenblum, stating that Miller, Hirsch, and Blaustein recommended that E *remain in the home based program in which he was currently involved* and that Miller, Hirsch, and Persky recommended a center based program *since* home based programs were not state funded programs. At the hearing, it was established that Rosenblum, Miller and the other Parkside evaluators were under the mistaken understanding that state educational law did not fund home based programs. (R. 00049–51).[17] The Parkside evaluators, therefore, recommended the center based program not because it was necessarily an appropriate setting for E but because they thought the home based program in which E was showing remarkable improvement could not be an IEP recommended placement because it was not state approved.

Moreover, it was established at the hearing, that the Fish, Hirsch, Blaustein, and Parkside evaluations, which CPSE relied on, were made prior to E's diagnosis as an autistic child and that their recommendations were made based on the understanding that E suffered from a language and communicative delay. This court has previously held in *Malkentzos v. DeBuono,* 923 F.Supp. 505 (S.D.N.Y.1996) (Motley, J), *remanded on other grounds,* 102 F.3d 50 (2d Cir.1996) that the educational agencies' satisfaction of the obligation under IDEA of meeting the educational needs of a disabled child on a per-

---

**17.** The New York statute that was read into the record (R. 00063) provides that "nothing herein shall preclude an approved program from pro-

viding services in a preschool child's home." N.Y.Educ.Law § 4410(9)(e).

sonal and substantive level "means recognizing [the child's] differences as an autistic child and addressing it ... [D]istinction between autistic children and otherwise developmentally disabled children [is] highly relevant." *Id.* at 515.

In this case, as in *Malkentzos*, reliance on expert evaluations that do not recognize E as an autistic child with distinct problems that are different from and perhaps more complex than a child suffering from language and communication delay renders an IEP based on these evaluations inappropriate. *Id.* at 514. On the other hand, Perry, and both the Cohen, and Palazzo evaluations, submitted to CPSE for review and as evidence at the hearing, all acknowledge E's autistic disorder and recommend that he remain in the home based ABA program using discrete trial instruction. Cohen and Perry both wrote that ABA was extremely labor intensive and had to be continued throughout the day. Both noted that such intensity was necessary for autistic children and particularly, E, if he was to develop appropriately. Cohen, specifically, recommended 40 hours per week with a ratio of 1:1 of staff to Eric. (Exs.G, H).[18]

Rosenblum testified that another reason CPSE chose AMAC, the center based program, over E's home based program was because of the assurances made by Blausten that E would have a one to one aide with 25 hours of ABA instruction and could receive a beneficial education at AMAC. As a preliminary matter, the court notes that neither Rosenblum nor Blausten interviewed or evaluated E personally (R. 00096), therefore, their opinions carry less weight than the evaluators who have personally met him. Since an IEP is to be fashioned based on the particular needs of E and not autistic children generally, "it is elementary that those who have personally met and evaluated [the child] are far better positioned to discern what is appropriate for him." *Malkentzos*, 923 F.Supp. at 515.

Although the IEP provided for 25 hours per week of ABA instruction by a one to one aide, Blausten testified that AMAC did not have a one to one aide for E as of yet. (H. 00127, 147). Although she testified that the hiring of an aide was not subject to state funding, she stated that AMAC did not have one readily available when AMAC was recommended as the appropriate placement for E. (H. 00150–151). Furthermore, when Blausten was asked for her understanding of ABA and AMAC's methodology, she stated "our methodology is one that approaches analysis of behavior and programming based upon data collection and training in a discrete trial basis. And whether or not it is one to one, or a group of two, or a group of three, we are able to meet these objectives." (R. 00106). When asked how ABA one to one instruction for E would work on a typical day, Blausten explained:

Usually the pattern is if fifteen minutes on, five minutes off, or twenty minutes on or five minutes off ... during the day the options include going to the gym with your one to one and having at least twenty minutes to a half hour of gym time ... during music, then that person would be sitting not face to face, on a one to one but in a group ... [and providing] specific discrete trial training or the instruction to [E] in specific areas within the schedule of the classroom. So that during the day three children are working, if a portion of the day the children are working on an activity and there is a parallel activity or training session with this happening during the day for [E] they are included as I said in the divided classroom, so there is an option he may be sitting on the side where there are one to one, where there is a table and a chair and the child is sitting next to the person—if it something that is done at a table perhaps it is done straight face to face on a one to one basis, where the person is directed to provide the instruction. Of for the teacher provides the general supervision for general ADL activities.

18. Although the HRO discredited Cohen's recommendation on the grounds that it "seemed to be tailored to fit the parent's specific home-based program already in progress," (R. 00309), this court finds no support for this characterization. As a matter of fact, Blausten at the hearing

testified on the impeccable credentials of Cohen, stating that she has known Cohen for fifteen years, that he was currently her medical director and was an expert in the area of autism. (R. 00097, 126).

Activities daily like going to the bathroom, it is hand over hand in some places or in sometimes with respect to the program, a para professional—a teacher assistant would be sitting outside of a group in a group setting if on the child's program it said that they would have music in a group of four. There is a music teacher there and then the para professional might be sitting, the teacher assistant might be sitting four feet from the person ... that is how it works.

(R. 00112–13, 139–140).

E's evaluators recommended intensive and continuous ABA discrete trial instruction, 40 hours a week. Given the description above of the services AMAC would have provided E, it is not clear to the court that E would have even received the 25 hour per week of ABA instruction.[19] Blausten makes reference to "fifteen or twenty minutes of instruction on with five off" and describes twenty five minutes of gym play on certain days and miscellaneous group activities, like music, on other days where the one-to-one aide will sit either in front of E or beside him during the teacher's lesson. This does not seem to

amount to 25 *intensive* hours per week of ABA instruction on a one-to-one basis for E and his aide. The evaluations make clear that E, an autistic child with his own individual problems, needs to continue in an intensive ABA program to encourage and develop his ability to relate with others and to derive an "educational benefit" from group socialization like the music, gym, and cooking classes and group interactions provided by AMAC. From the record, it is clear that the IEP did not provide E with the specialized educational and related services that would meet his unique needs as an autistic child,[20] particularly, in light of the fact that at the time AMAC was recommended as the appropriate placement for E, it had neither a one-to-one aide for him nor an appropriate ABA program in place to meet his needs.

Lastly, the court finds that although the SRO was correct in concluding that the HRO was incorrect in determining that the IEP was appropriate despite the fact that the short term goals did not reflect E's current ability because they could be modified to meet E's actual educational level once he began the program,[21] the SRO was incorrect

---

**19.** The court is not ruling here that the 25 hours (as opposed to the 40 hours recommended by Dr. Cohen) per week of ABA instruction is sufficient to meet E's needs. The court notes, however, that although IDEA does not require a state to provide services which maximize each child's potential, *Rowley*, 458 U.S. at 198, 102 S.Ct. at 3046–47, and only requires states to provide a "floor of opportunity" consisting of specialized education and related services designed to provide some benefit to the disabled child, CPSE submitted no evidence at the hearing showing that 25 hours a week was appropriate or provided a benefit. As a matter of fact, Blausten testified that AMAC was not providing the 40 hours per week recommended by Cohen because state law limited center based preschool programs to 25 hours per week. (R. 00124–125). However, the *Report on Preschool Special Education Issues in New York State* published by SED and dated September, 1995, addressing parental requests for extensions of special education services beyond 25 hours per week, stated that "there is currently no maximum level established for preschool special education programs and services ... our Office of Counsel advised that it is inconsistent with Federal Law to establish an absolute maximum level for the provision of FAPE." (Ex. N); (R. 00085–87).

**20.** In a letter that was not submitted to CPSE for review but was submitted by plaintiff into evidence at the hearing, Dr. Allison Lorys wrote:

I understand that the committee has recommended that [E] be placed at [AMAC], that the student/faculty ratio at AMAC is 7:1:1 and that [CPSE] has also recommended that [E] have a 7:1:1 aide while at AMAC to continue his receiving discrete trial instruction.

It is my opinion that the recommendation is based upon an incorrect understanding of the discrete trial methodology. Discrete trial instruction on a 1:1 basis is a repetitive educational method which requires a focus on a single child and is inconsistent with class instruction. If [E] is receiving discrete trial instruction, he will be unable to participate in class activities (and indeed they may serve as a distraction which would reduce the efficacy of the instruction) ... while classroom instruction can be used for socialization, this is generally a secondary goal for students such as [E]. (Ex. S).

**21.** As the court has already noted, the IEP is the modus operandi of IDEA and has to be accurately formulated to reflect the child's current level of development and needs. City defendant's cite *Roland M. v. Concord School Committee*, 910 F.2d 983, 992 (1st Cir.1990) to argue that E's IEP was appropriate despite the incorrect short term goals because it was based on the earlier

in affirming the HRO finding that the IEP was appropriate because AMAC was the least restrictive placement for E. IDEA emphasizes the education of disabled children with non-disabled children,[22] which is commonly referred to as "mainstreaming." *Briggs*, 882 F.2d at 691. The Second Circuit has noted, however, that some disabled children must be educated in segregated facilities either because of their disruptive behavior in a regular educational setting or because the gains from mainstreaming is marginal as compared to segregated instruction and concluded that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to disabled children. *Id.* at 692.

In this case, placing E in AMAC, a therapeutic nursery that provides an educational setting for autistic children and children with pervasive developmental disorders, is clearly a segregated placement and contrary to "mainstreaming." The only basis for the "appropriateness" of such a placement is the recommendations of those evaluators who evaluated E prior to his diagnosis as an autistic. The court has already discussed the minimal weight it places on these recommendations. Moreover, although City defendants argue in their motion papers that the AMAC placement was the least restrictive environment and the HRO and SRO agreed, Rosenblum admitted at the hearing that the AMAC placement was the most restrictive. (R. 00065). E's home based ABA instruction may also seem contrary to the mainstreaming objective since E is removed from a regular educational setting with non-disabled children. However, the court notes that none of the expert evaluations recommended complete mainstreaming as appropriate for or beneficial to E's educational development but most concluded that E's home based ABA instruction supplemented with his three classes with non-disabled children several times a week was the appropriate and beneficial program for E given his unique needs.

## CONCLUSION

Given the administrative record together with the additional evidence, the court finds that the IEP prepared by the CPSE at the January 13, 1995 meeting did not provide plaintiff's son with a free and appropriate education that would render some educational benefit to him in violation of the IDEA. For the reasons cited above, this court grants plaintiff's motion for summary judgment.

**SO ORDERED.**

---

evaluations and was therefore, a "snapshot" of E's development at a particular time. The court finds this argument weak because CPSE had the evaluations before them which adequately diagnosed E as autistic and made recommendations based thereupon. The IEP cannot be a "snapshot" of E's development at that point in time if CPSE ignored or failed to give due weight to these evaluations. At the January, 1995 CPSE review, the Committee was aware of the marked improvement E had made since undergoing ABA, however, some of the short term goals in the IEP were objectives that E had already accomplished as was indicated in the expert evaluations. (R. 00224–228). Moreover, at the hearing, Mr. X submitted a voluminous detailed log of E's progress of increased vocabulary, game playing with others, and following of instructions since the inception of the home based program. (Ex. P); (R. 00435–1599). There was, therefore, ample opportunity in this case to construct an IEP that was reflective of E's level of development.

22. IDEA provides that states must assure that:

> to the maximum extent appropriate, handicapped children, ... are educated with children who are not handicapped, and that special classes, separate schooling, or *other removal* of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B)(emphasis added).