**CM, a minor, by and through her parents, JM and EM, and on their own behalf, Plaintiffs,**

v.

**THE BOARD OF EDUCATION OF HENDERSON COUNTY, a/k/a Henderson County Public Schools, Inc., Defendant.**

### No. CIV. 1:98CV66.

United States District Court, W.D. North Carolina, Asheville Division.

Oct. 12, 1999.

---

Paul Lawrence Erickson, Asheville, NC, Shelli J. Lewis, Corona, CA, Pauline F. Laubinger, N.C. Governor's Advocacy Council for Persons with Disabilities, Raleigh, NC, for Plaintiff/Petitioner.

Louise Paglen and Ann L. Majestic, Raleigh, NC, for Defendant/Respondent.

### MEMORANDUM OF DECISION

THORNBURG, District Judge.

**THIS MATTER** came on for trial before the undersigned on August 19, 1999. Having considered the arguments of counsel, pleadings submitted and the administrative record, the Court enters the following findings of fact and conclusions of law.

### I. PROCEDURAL HISTORY

JM and EM on behalf of CM, their autistic child, initiated this action pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400, *et seq.*[1] 20 U.S.C. § 1401(a)(1)(A)(i). Plaintiffs claim that the Henderson County Board of Education (County) denied a free appropriate public education (FAPE) to their child, as required by the IDEA. 20 U.S.C. § 1401(a)(18).[2] On December 11, 1997, Administrative Law Judge (ALJ) Meg Scott Phipps found that the County had offered to provide the child with a FAPE as required by federal and state law. Plaintiffs filed an administrative appeal and State Review Officer (SRO) Joe Walters affirmed the ALJ's decision on March 4, 1998. Having exhausted their administrative remedies, the parents

---

1. The disorder of autism is defined as a "preoccupation with inner thoughts, ... egocentric, subjective thinking lacking objectivity and connection with reality." *Dorland's Medical Dictionary* (28th ed.1994).

2. That section defines the term "free appropriate public education" as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title."

brought this action pursuant to the IDEA. 20 U.S.C. § 1415(e)(2).

·By Order filed June 16, 1999, the undersigned disposed of several matters in this action. Chief ALJ Julian Mann granted partial summary judgment to the County as to Plaintiffs' claim for reimbursement for an independent educational evaluation above the sum of $1,200. He also ruled that all claims prior to the 1996–1997 school year were time-barred. The undersigned affirmed those rulings, finding that Judge Mann's conclusions were supported by a preponderance of the evidence. In addition, the Plaintiffs' claims pursuant to the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. § 1983, and the 14th Amendment to the Constitution as well as all claims asserted against the individual Defendants were dismissed. Plaintiffs' claims for the school years 1997–98 and 1998–99 and for punitive damages were also dismissed. Thus, the only claims remaining relate to the 1996–97 school year: the IDEA claim for declaratory relief and a cause of action pursuant to N.C. Gen.Stat. § 115C–106.[3] *See* Memorandum and Order, filed June 16, 1999, at 35–37.

## II. STANDARD OF REVIEW

Section 1415(e)(2) of Title 20, United States Code, provides in pertinent part that in "any action brought under this [statute] the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." The Fourth Circuit has instructed district courts to bear in mind that "the touchstone of IDEA is the actual provision of a free appropriate public education." *Sellers by Sellers v. School Bd. of City of Manassas, Va.,* 141 F.3d 524, 527

(4th Cir.), *cert. denied,* 525 U.S. 871, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998).

The Supreme Court has held that a proper review of the state's determination requires a twofold inquiry. *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The district court must decide: (1) whether the State complied with the IDEA's procedural requirements in developing and implementing the Individualized Education Program (IEP) for the child at issue, and (2) whether the IEP is "reasonably calculated" to enable that child to receive educational benefits. *Id.,* at 206–07, 102 S.Ct. 3034. The Court also instructed reviewing courts to make "independent decision[s] based on a preponderance of the evidence." *Id.* The Fourth Circuit refined this standard in *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100 (4th Cir.1991), where it held that findings of fact by ALJ's and hearing officers in IDEA cases "are entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such factfinding, but not requiring it." *Id.,* at 105. In essence, district courts must " 'make an independent decision based on a preponderance of the evidence, giving due weight to state administrative proceedings.' " *Board Educ. of Montgomery County v. Brett Y.,* 155 F.3d 557 (table), 1998 WL 390553 at *5 (4th Cir.1998) (quoting *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034).

Moreover, the district court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *Hartmann by Hartmann v. Loudoun County Bd. Of Educ.,* 118 F.3d 996, 999 (4th Cir.1997), *cert. denied,* 522 U.S. 1046, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998). Indeed, the district court must defer to the State reviewing officer's (SRO) credibility determinations. *Doyle, supra.* And, the SRO must defer to the

---

**3.** "The policy of the State is to provide a free appropriate publicly supported education to

every child with special needs."

credibility determinations made by the hearing officer because he or she had the opportunity to hear the testimony. *Id.*, at 104. Finally, the burden of proof of establishing a violation of the IDEA falls on the party challenging the administrative findings. *Barnett by Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.1991).

As to the standard of review applicable to the state law claim, "[n]o distinction is made between federal and pendent state claims if the claims are brought in federal court. Although the North Carolina Administrative Procedure Act limits a state court reviewing an agency decision to substantial evidence review, ... 'pertinent federal law ... specifies otherwise.' The district court properly followed federal procedural law in reviewing independently both the federal and state law claims." *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 983 (4th Cir.1990) (citations omitted).

### III. FINDINGS OF FACT

#### A. The IEP for the 1996–97 school year.

Plaintiffs moved from New Hampshire to North Carolina in 1993 for the sole purpose of placing their child in the TEACCH [4] program offered through the state's schools. Volume III, Certified Transcript of Hearing before the Office of Administrative Hearings, at 13 (hereafter, Transcript, Vol. III, at 13.). CM was first enrolled in the County school system in August 1993. Exhibit A, Affidavit of Judy Cook, *attached to* Respondent's Brief in Support of Summary Judgment, filed in the Office of Administrative Hearings on February 26, 1997. An IEP was developed for her and she was placed in the Helping Hand Center which offered a TEACCH preschool program. *Id.* However-

er, in November 1993, after only three months in the program, CM's parents withdrew her from the program in order to implement the Lovaas [5] program in their home and to place her in a Montessori preschool. *Id.;* Respondent's Exhibit 72 before the Office of Administrative Hearings, Letter dated November 23, 1993, from JM to County. The County continued to provide CM with free speech therapy, although not required to do so under state law.[6] Cook Affidavit; Transcript, Vol. XI, at 132.

In September 1994, JM met with Candy Priest, Supervisor of the Exceptional Children's Program for the County, to obtain a copy of CM's file. *Id.* During that conversation, JM explained CM's progress in the Lovaas program and Ms. Priest volunteered that the County could provide services to CM in her preschool setting. *Id.*, at 144. JM declined, stating that he had not informed the preschool that CM was autistic but had advised only that she had a communication disorder. *Id.*

However, in December 1994, the Plaintiffs approached the County about paying for the Lovaas therapy they were providing CM in their home. *Id.*, at 144–45. A series of meetings were held in January and February 1995 to develop an IEP for CM. *Id.*, 145–46. Ms. Priest testified,

> Over and over again it just kept coming back that—that, yes, we were proud of her academic skills, but what she absolutely had to do was use these skills and use her language to communicate functionally.... We were finding that C. could-could respond to a prompt, but that was—I mean, every time we saw her, someone had to say, "C., say hello," .... [T]here was always someone there with her, either guiding, moving her or ... it was always a prompt and then

---

4. Treatment and Education of Autistic and Related Communication Handicapped Children program.

5. Dr. Ivar Lovaas developed a form of treatment for autistic preschoolers.

6. In fact, at the time of the hearing in 1997 the County continued to provide speech services to the child. Transcript, Vol. XI, at 142.

expecting a response. And we in education know that's not—that's not how we-how we learn or how we progress or how we-how we survive in society. *Id.*, at 150–51. The County considered four options for CM: the Helping Hand Program, Sharon Burlingame's preschool handicapped classroom, the Lovaas program and the Bruce Drysdale's autistic classroom.[7] Transcript, Vol. VI, at 196. The County concluded the best option for CM was Bruce Drysdale's full-day autistic classroom with some mainstreaming into the regular kindergarten. *Id.*, at 197. By mid-February, the County had completed the IEP for CM but her parents continued to insist that the County fund a Lovaas program. *Id.*, at 204; Cook Affidavit.

There was no further contact from the Plaintiffs until June 1995, when they requested an independent educational evaluation of the child. Cook Affidavit. Because the last evaluation had been completed two years prior to that time, Ms. Cook felt it was necessary to obtain a more recent evaluation. *Id.* In the event the parents disagreed with that evaluation, they could then pursue an independent evaluation. *Id.* School personnel evaluated CM in August and September 1995. Transcript, Vol. VIII, at 219–20. Plaintiffs disagreed with the County's evaluation and requested an independent one be performed. Cook Affidavit, *supra*. Ms. Cook then sent them a letter outlining the procedures, including the $1,200 limit for reimbursement, and listing facilities and agencies competent to perform the evaluation. *Id.* Plaintiffs responded that four of those suggested were not competent to perform the evaluation, the fifth was re-

jected by the Plaintiffs as biased, and the sixth had a waiting list. Respondent's Exhibit 117, Letter from JM to Judy Cook, dated January 5, 1996. The parents obtained an evaluation from Dr. Jan Handleman in New Jersey, the full cost of which the County refused to reimburse. Cook Affidavit, *supra*. The undersigned has previously affirmed the grant of partial summary judgment on this issue by the ALJ on the ground that the parents were unreasonable.

Dr. Handleman issued his report on March 25, 1996, and it was received by the County in April 1996.[8] Respondent's Exhibit 57. He concluded that "[a]pproximately forty hours a week of comprehensive behavioral programming is suggested, which emphasizes individualized and discrete-trial teaching[9] . . . . Altering the current commitment to specialized and individualized programming could negatively impact on the very positive gains that [CM] has made and the momentum she is demonstrating toward future educational accomplishments." *Id.* Dr. Handleman testified that he did not conduct any standardized tests on CM but reviewed test scores and records provided to him by the Plaintiffs. Video Deposition of Dr. Jan Handleman. He observed CM for two hours while she was with her Lovaas therapist. *Id.* In addition, he reviewed a video taken of CM by her mother. Transcript, Vol. V, 42. Dr. Handleman admitted that he had relied, in forming his opinion, on information which could have been incomplete. Video Deposition, *supra*. For example, he was unaware that CM's therapist was a recent college graduate. *Id.* The videotape showed CM's behavior as

---

7. Within the County is located the Bruce Drysdale School at which a classroom for autistic children was in existence.

8. Interestingly, before the County could review Dr. Handleman's report, the Plaintiffs had already reported to CM's preschool that she would be attending a small private school during the coming year. Respondent's Exhibit 188.

9. "Discrete trial teaching (DTT) is one component of the Lovaas type of [applied behavioral analysis] and involves a directive followed rapidly with a consequence based on whether the student gives the correct response." *T.H. v. Board of Educ. of Palatine Community Consol. Sch. Dist. 15,* 55 F.Supp.2d 830, 836 n. 8 (N.D.Ill.1999).

stabilized and compliant; but, he admitted that he was unable to assess any behavior which would not have been shown on the tape. *Id.* And, he admitted he was not provided with any information about the County's program except that given by the parents. *Id.*

At this point, the only IEP for CM was the one prepared in the fall of 1995. The Plaintiffs had submitted a copy of this IEP to Michael Guiou, their Lovaas consultant, who contested many of the assessments. Respondent's Exhibit 9. When Judy Cook received Dr. Handleman's report, she felt it did not add any substantive information which could be used in drafting a new IEP. Transcript, Vol. VIII, at 224. But, CM's parents and Mr. Guiou contended she had mastered many of the goals on the 1995 IEP and based on Dr. Handleman's report, the County could not assess the validity of that contention. *Id.;* Transcript, Vol. IX, at 18. Moreover, Dr. Handleman's report contained no information concerning CM's current level of performance; it was simply an observation devoid of the type of information necessary to draft an IEP. Transcript, Vol. IX, at 12. Therefore, because CM's parents were challenging the 1995 IEP as inadequate and inappropriate, Ms. Cook felt an additional evaluation was appropriate, especially in view of the months which had passed. Transcript, Vol. VIII, at 224. As a result, Ms. Cook obtained, with the parents' consent, an informal assessment of CM by Dr. Victoria Shea, an expert on autism. Transcript, Vol. VIII, at 225–28; Vol. XVIII, at 127–41.

Dr. Shea observed CM at her preschool and in her home program for a total of three hours and received and reviewed her records. *Id.,* at 228; Respondent's Exhibit 58.

By report and observation, [CM] demonstrates typical features of autism (i.e. impairments in social and communication skills, and unusual behaviors and interests). At the time of the last standardized assessment (8/95), she demonstrated widely scattered cognitive skills, low average adaptive skills, significant expressive language delays, and minimal fine motor delays. I observed [CM] to be very compliant with verbal directions from her tutors. In the absence of these verbal prompts, however, I observed several instances in which she was confused about what to do, where to go, how long to continue, or what would happen next.... The comments on [the County's] draft IEP by the UCLA consultant [Michael Guiou] indicated that the majority of the proposed objectives had been mastered.... However, there were [ ] skills described as mastered which I observed [CM] not to have mastered. These included responding to her name without prompting, making a choice between activities (several times when given a choice she said "yes"), washing her hands independently (she need a prompt to stop), and responding accurately to questions (Is Jessica your Daddy? "yes;" Where does Minnie Mouse live? [CM] gave her own address). I also observed that [CM] appeared to have memorized some expressive language that she did not fully understand (when asked the steps involved in washing her face, [CM] began "turn off water, get bathing suit ..." and needed a prompt for "soap" before continuing with logical steps of rinsing, etc.). Since present level of performance is the foundation for development of IEP goals, the question of [CM's] current skill levels is problematic.... The evaluation report by Dr. Handleman (3/96) did not contain specific information about skill levels. Based on my observations, I question the representation by the UCLA consultant that almost all the proposed IEP objectives have been mastered.... A second comment on the [County's] draft IEP is that I think a major focus of [CM's] education should be on the development of independence. Like many students with autism, [CM] has learned to follow directions from adults.... While [CM]

can memorize and repeat fairly lengthy sequences of verbal dialogue, her functional use of language is much more limited.... From my observation in the preschool, [CM] already feels comfortable with parallel play near other children, and she accepts social interactions initiated by familiar peers.... I [make] recommendations to increase the emphasis on independence, functional communication, and concepts underlying social interactions.

Respondent's Exhibit 58. Dr. Shea had other reasons for doubting the conclusions reached in Dr. Handleman's report. When she reviewed CM's records and notes from her preschool and therapy, there were reports of tantrums and screaming during the same time period that Dr. Handleman observed CM to be compliant. Transcript, Vol. XVIII, 159–62. In fact, notes from the Lovaas therapy show that in January 1996, CM was "still throwing tantrums quite a bit." UCLA Book 7 (CM's Therapy Log Book), Bates No. 005641–42. In the spring of 1996, her behavior was so bad that her Lovaas therapist reported that if something did not change, CM would be expelled from school. Transcript, Vol. XIV, 238. And, in September and October 1996, CM was still having tantrums, biting and butting her head. UCLA Book 7, Bates Nos. 005607, 005612, 005614.

At the end of CM's preschool for 1996, her mother asked her teachers to respond to a questionnaire concerning her development. Respondent's Exhibit 194. A comparison of their responses to the opinion of the Michael Guiou shows that many of the items he felt were mastered had presented problems in preschool, especially communication skills. And, her preschool teachers' responses showed that most of CM's positive behavior followed prompting by her Lovaas therapist.

In addition to the assessment by Dr. Shea, Ms. Cook had Laurie McDanel, an exceptional children teacher, and Janna Beekman–Forst, a psychologist, visit with CM in May 1996. Respondent's Exhibits 59, 59A. They observed CM during a Lovaas therapy session. Transcript, Vol. X, 169. Although CM could respond to questions such as, "What would you do if ...," she was unable to answer questions such as, "What did you have for lunch?" *Id.* In between questions, she would engage in unintelligible speech. *Id.,* at 170. Her therapist told her a story and then asked CM to repeat it but she was unable to do so. *Id.,* at 172. She did not independently, or with prompting, engage in imaginative play. *Id.,* at 173. During the breaks which CM was given, she began to play and communicate but was halted and told to go back to work. *Id.,* at 181. This seemed self-defeating to Ms. McDanel, who teaches autistic children in the County system. From her observation of CM, the child was not enjoying herself. *Id.,* at 184. In her professional opinion, the Lovaas therapy

> was very intense. I thought that it seemed to ask her to provide lots of things from memory, wasn't eliciting anything spontaneous, but required her to rely upon her rote memory. I thought it was a lot of auditory directions that can be very overpowering to a child with autism and to some adults. I did not feel that what she was able to produce during that time was— that what she actually produced, I think, could have been done in less than two hours of time—that intense time of constantly going over the same things over and over. And I also thought that many times it was really unclear, because it was unclear to me, whether she actually got the answer right or not. It was either "pretty good" or they kept repeating the same question, and she kept answering the same answer. So I think that's confusing.

*Id.,* at 185. Ms. McDanel also met with CM's mother after this session in order to obtain additional information for use in preparing an IEP. *Id.,* at 186. She was not told during any of these meetings that

there were behavioral problems with CM. *Id.*

Dr. Shea felt that CM's current level of performance was not known and suggested the re-administration of the Brigance test prior to formulating the IEP. Transcript, Vol. IX, at 20–22. The Plaintiffs did not agree to the administration of that test and determined to have private testing done prior to the IEP meeting. Transcript, Vol. V, at 43–45. They chose Dr. Thomas Boyle, a psychologist in New Jersey who in the past had worked with Dr. Lovaas. *Id.,* at 48. Dr. Boyle administered standardized testing but admitted in his report that the standard protocol had to be modified at times in order to allow CM to participate in the task. Respondent's Exhibit 60. Those modifications would have increased her ability to perform well, if they had any impact. Transcript, Vol. XV, at 73. He concluded that if she were placed in a full-day school, she would require 15 to 20 hours per week of one-on-one teaching focusing on her language deficits. *Id.* Initially, Dr. Boyle included CM's IQ scores in the report; however, her parents asked him to delete them. Transcript, Vol. XV, at 21. When Dr. Boyle prepares an evaluation for a school, it is his normal practice to report the IQ scores. *Id.,* at 95. CM's full scale IQ was 57 which is in the mildly mentally handicapped range. *Id.,* at 94, 113. Her language skills were very poor; and thus, he could not be sure she understood the questions being asked. *Id.,* at 24. He found she was able to respond to some things through rote memory but when a task required understanding the meaning of a sentence, she had difficulty. *Id.,* at 27.

Dr. Boyle was contacted again by the Plaintiffs in early 1997. They wanted him to evaluate CM a second time because they felt her true abilities were not shown in the July report and at the time, her medi-

cation was being changed. *Id.,* at 57; Respondent's Exhibit 61. CM's mother asked him to use different standardized tests than had been used in the July testing so that no one would think she had been trained on the test. Transcript, Vol. XV, at 57. In Dr. Boyle's opinion, that was an unusual request because "no one has ever said that to me before. No one has ever expressed that someone might do that. But no one has ever requested a reevaluation that quickly either." *Id.* The Plaintiffs had a particular concern about CM's IQ scores. *Id.,* at 119–20. Dr. Boyle found that CM's IQ scores had increased but she still had significant deficits in expressive and receptive language skills. *Id.,* at 58–59. He did not alter his recommendation. Dr. Boyle was not told of any behavior problems with CM during either evaluation. *Id.,* at 68.

The Plaintiffs retained a third person to evaluate CM. Dr. Jan Blacher is an education professor in California who observed both CM and the County's autistic classrooms in August 1996. Dr. Blacher provided written observations to the Plaintiffs concerning the TEACCH classrooms which contained scathing criticisms of the teachers, the aides, and the program in general.[10] Respondent's Exhibit 62. Nonetheless, she testified that CM did not need 40 hours per week of Lovaas therapy and should be in a classroom setting part of the time. Transcript, Vol. VIII, at 13.

On August 14, 1996, the parties were finally able to have a meeting concerning CM's IEP for the 1996–97 school year. Respondent's Exhibit 68. The Plaintiffs felt the goals set for CM were very well done. *Id.* CM's mother expressed her desire that CM be placed in a classroom with "typically developing peers" for half the school day and 20 hours per week of one-on-one instruction. *Id.* Ms. McDanel stated she was concerned that CM might be unable to adjust and perform in a class-

---

10. Ms. McDanel, the teacher whom Dr. Blacher observed, strenuously contested the comments made.

room of 20 children since she had never been with such a large group. *Id.* At the Plaintiffs' request the meeting was adjourned to a later date when CM's Lovaas consultant would be able to attend. *Id.*

The second meeting occurred on September 13, 1996, and was attended by Michael Guiou, the Lovaas consultant. Respondent's Exhibit 69. Also present was a kindergarten teacher from a regular kindergarten class since there was a possibility CM would be placed there. *Id.* The Plaintiffs acknowledged that the draft IEP was "a very good IEP" to which they had made minor changes after consulting with Mr. Guiou. *Id.* Of primary concern was the distinction between individualized instruction versus one-on-one instruction. *Id.* Ms. Cook explained the two terms could mean the same thing; but, primarily, individualized instruction is instruction designed to meet the unique needs of a child. *Id.* There would be no guarantee of one-on-one instruction for a certain period of time each week because the teacher is allowed to use the type of instruction necessary to teach the skill involved. *Id.* Although agreeing that the IEP goals were good, Mr. Guiou felt CM must have one-on-one instruction. *Id.* Ultimately, Plaintiffs explained that by one-on-one instruction they meant a "shadow," an aide or teacher, should be available throughout each day to assist CM. If she did not understand what the teacher was teaching, the shadow was to step in to assure CM would grasp the task. *Id.* Plaintiffs agreed that much of the time this person would not be needed; yet, they insisted such a person be available. *Id.* It was explained that in the County setting such a person was available but not exclusively for CM. *Id.* Because it was clear an agreement concerning placement could not be reached, the parties went through the IEP goals. *Id.* When a discussion of individualized versus one-on-one instruction resumed, it was clear that the difference lay in methodology. This meeting lasted for at least half of the day. Transcript, Vol. IX, at 51. During this and the prior meeting there was no mention that CM was experiencing any behavior problems. *Id.* This was important information because it should have been addressed in the IEP. *Id.*, 52. The next meeting was scheduled for September 23, 1996.

At that meeting, Ms. Cook presented significant revisions to the IEP based on the last meeting; and again, the parties reviewed the IEP paragraph by paragraph, page by page. *Id.*, at 54. The parties, and their attorneys, reached an agreement on the goals. *Id.*, at 55. The IEP called for CM to receive a full-day program with half of each day in a regular kindergarten class accompanied at all times by an adult (shadow) to assist as needed, one-on-one instruction from Ms. McDanel, the special education teacher, in reading, math and written language for one and a half hours each day, guided instruction for one hour each day in the autism classroom and three hours of speech therapy each week. Respondent's Exhibit 70. The Plaintiffs responded that they did not want CM in the autistic classroom for any portion of the day because she might learn inappropriate behavior. *Id.* It was explained that while CM was there the other children in that classroom would either be doing their own "mainstreaming" or independent activities, thus reducing the possibility that CM would see inappropriate behavior and learn to imitate it. *Id.* The Plaintiffs did not agree and continued to insist on their choice of placement. In addition, they asked that the school system pay for the speech therapist to travel to CM's private school to provide therapy because EM, the mother, did not have the time to take CM to the therapist's private office. *Id.* It was explained that the school system could not send a therapist into a private school. *Id.*

The IEP drafted for CM for the 1996–97 school year provided for CM to have "one-to-one instruction to learn new academic skills. She needs guided practice with an adult to maintain skills. She needs sociali-

zation and communication skills which can best be practiced with typically developing peers. Expanded language goals necessitate additional speech." Respondent's Exhibit 10. As a result, CM was offered a program providing her with five hours per week of guided instruction in the autism classroom, seven and one-half hours of one-on-one instruction, three hours of speech therapy and the remainder of her time in a regular kindergarten classroom accompanied at all times by an adult. *Id.* The Plaintiffs did not accept the IEP because it did not provide the Lovaas methodology and would have placed CM in the autism classroom for a portion of each day. *Id.* Both parents testified that the only program they would have accepted was the Lovaas program. Transcript, Vol. VI, at 110. By that, they meant not only a Lovaas shadow with CM at all times, but also the use of discrete trial teaching. Respondent's Exhibit 7. And, they insisted that the shadow be the same person each day. Transcript, Vol. VI, at 115. Moreover, the Plaintiffs did not approve of the method described by Ms. McDanel for dealing with tantrums which occur in the regular classroom because a child having tantrums would be returned to the TEACCH classroom. Transcript, Vol. VI, at 108.

For the 1996–97 school year, CM was placed in the K–2 [11] class at the Covenant Academy, a private religious school with six children in the class: four kindergartners, a first-grader and a second-grader. Transcript, Vol. XIV, at 178–79. CM's shadow for the school year was Caroline Dilworth, who had been her Lovaas therapist the prior year. Dilworth, who has a college degree in psychology, began working with CM two months after graduation and without any background in working with autistic children. *Id.,* at 198. Despite the low student ratio, CM's kindergarten teacher, Ms. Salter, did not have a very organized curriculum and was not thought to be a good teacher by Ms. Dil-

worth. *Id.* Salter was replaced in February 1997. *Id.*

In the fall of 1996, CM's mother recorded in her logs that CM had forgotten much of what she had learned, had become lazy and still had not obtained spontaneous language. *Id.,* at 203, 205. Ms. Dilworth, who accompanied CM to school each day, reported in October that CM was not responding to her name or to naturalized statements appropriately. *Id.,* at 288. She required much prompting to participate in class. *Id.* At the end of October, Ms. Dilworth reported: "Many times prompted today. One time, no prompt. Note: This is an area of growing concern. At times her peers yell her name two or three times before she will or not look their way." *Id.,* at 289. And, CM did not listen when her teacher read stories, although she did do so when Ms. Dilworth read the story. *Id.,* at 292. Ms. Dilworth readily admitted that "it could have been because she has been working with me for two years . . . ." *Id.* All through the spring of 1997, CM required frequent prompting. *Id.,* at 208–12. Although present in the classroom as CM's Lovaas shadow, Ms. Dilworth also worked with other children and not exclusively with CM. *Id.,* at 294.

CM continued to have behavior problems in 1996. *Id.,* at 220, 256–63. In fact, during the first months after CM began Covenant Academy, she had significant problems with tantrums. *Id.,* at 263–66. She had tantrums on an almost daily basis, many of which were witnessed by her peers, resulting in problems in her socialization. *Id.* On one occasion, she had a tantrum while the teacher was out of the room. Ms. Dilworth, who had been left alone with the classroom, could not remove CM from the room and thus, her classmates witnessed a ten minute tantrum. *Id.,* at 266. This occurred on the same day that Michael Guiou, CM's Lovaas consultant, met with the school officials concerning her IEP; yet, no mention was made to them of these problems. *Id.* This type of

11. A class encompassing children from kindergarten through the second grade.

behavior continued throughout the fall despite various methods of dealing with them by her therapists. *Id.*, at 267–76. In fact, new behavior problems appeared in October and November of 1996: biting and hair pulling. *Id.*, at 277. In January 1997, CM's tantrums at home were averaging eleven minutes in length and included biting, hair-pulling, screaming and kicking. *Id.*, at 279. And, in mid-January 1997 she had two tantrums at school. *Id.*, at 283. In fact, Ms. Dilworth reported in early 1997 that it was necessary to remove CM from the classroom in order to work with her on academic work. *Id.*, at 285.

## B. The methodologies at issue.

The Lovaas methodology was developed by Dr. Ivar Lovaas as a result of a three year study conducted of 19 children who were diagnosed as autistic. Petitioner's Exhibit 14, "Behavioral Treatment of Autistic Children". All of the children were aged three or under and received 40 hours per week of one-on-one instruction in their home. *Id.* At the end of the study, nine of the children had achieved normal IQ's and were described as indistinguishable from their peers. Eight were placed in aphasic (communication handicapped) classes and the remaining two were in autism or special education classes. *Id.*

Dr. Jacqueline Wynn is the director of the Lovaas Institute and testified as an expert in the use of Lovaas therapy to treat autistic children.[12] Lovaas therapy is one version of Applied Behavioral Analysis (ABA) which "consists of breaking down activities into discrete individual tasks and rewarding the child's accomplishment. The child eventually learns to integrate the information and associate instruction with a given activity." *Mr. X v. New York State Educ. Dept.*, 975 F.Supp. 546, 548 n. 1 (S.D.N.Y.1997); Transcript, Vol. XIII, at 71. Discrete trial teaching is one aspect of the program and involves a prompt to the child followed rapidly with a consequence based on whether the child gives the appropriate response. *Id.*; *T.H.*, *supra*. In the Lovaas program, when a child has negative behavior, the therapist analyzes why and in what context it is happening. Transcript, Vol. XIII, at 27–28. This allows the therapist to determine the reason behind the behavior, such as seeking attention, and to predict when it will occur. *Id.* Then, the therapist devises an intervention plan, a plan to stop the behavior. *Id.*, at 29. For example, if the behavior is occurring because the child is frustrated by a task, it may be that the task is too difficult and therefore, needs to be broken down. *Id.*, at 30. "[M]any of the original Lovaas techniques are no longer considered appropriate, e.g. using electroshock as an adverse consequence." *T.H.*, 55 F.Supp.2d at 836 n. 8. Another technique originally used was hitting the child if he or she engaged in self-stimulatory behavior. Transcript, Vol. XIII, at 206–07.

The Lovaas program designs a treatment package for the child which begins with 40 hours per week of one-on-one instruction in the child's home. *Id.*, at 45. Later, more and more of the time is spent in a socialization setting of school, peer play and community activities. *Id.* An essential component of the program is the involvement of the parents in the therapy so that any gains made by the child with his therapist are not lost. *Id.*, at 45–46. The parent is expected to help the child generalize the skills learned during therapy to the everyday world. *Id.*, at 75. According to Dr. Wynn, a major difference between Lovaas therapy and other treatments for autistic children is that intervention in the Lovaas program begins at the preschool versus school age. *Id.*, at 49.

The program also uses a therapy log which provides continuity among the therapists and aides involved. *Id.*, at 96. It is used to record behavior, skills and problem areas. *Id.* It becomes a record of what a child knows and does not know. *Id.* The program has an hierarchy of goals in dif-

---

12. She was not accepted as an expert in the disease of autism.

ferent categories which are to be mastered. *Id.*, at 160. Once a skill is mastered, the child is moved on to a new one. *Id.*, at 102. If he or she regresses, the therapist goes back to the last skill. *Id.*, at 105. The ultimate goal is for the child to generalize the skills learned in therapy. *Id.*, at 103. Thus, drills are used to teach the children. For example, the receptive label drill is designed to make sure the child understands the name of an object, rather than repeating it from rote memory. *Id.*, at 32. This is done to ensure that the child relies on auditory versus visual skills in processing language. *Id.*, at 33. The Lovaas program relies on prompts to ensure that the child acquires a skill and remains successful with it. *Id.*, at 121–22. "But the goal is to start with the prompt and then fade out the prompt and get rid of it so the child is working independently." *Id.*, at 122. Successes are reinforced, usually by physical contact or food. *Id.*, at 37. Eighty percent of the Lovaas program focuses on the development of language skills. *Id.*, at 110. Typically, the program begins around age three and continues until seven or eight. *Id.*, at 135. On cross-examination, Dr. Wynn testified that the TEACCH program also begins at preschool age and relies on heavy parental involvement. *Id.*, at 181.

Dr. Lee Marcus is the clinical director of the TEACCH Center in Chapel Hill, North Carolina. Transcript, Vol. XIX, at 6. The TEACCH program creates a classroom environment for autistic children which is predictable and therefore understandable. *Id.*, at 76. Structure is very important to autistic children because they cannot handle numerous stimuli at once. *Id.* The physical space of their classroom is arranged in a manner that explains to the child what will happen in different parts of the learning program. *Id.*, at 77. Thus, the autistic child, who has strong visual skills, is able to rely on those skills to feel comfortable with the setting. *Id.*, at 78. The program also relies on structure in the form of a daily schedule because autistic children have difficulty understanding the

concept of time. *Id.*, at 79. The daily schedule is presented to the child according to each child's abilities. Id., 80. Thus, some may be written and others may rely on color cues. But the purpose of the schedule is to allow the child to know in detail what will occur at each portion of the day. *Id.*, at 81. This is done because autistic children do not understand the concept of sequencing and become very anxious about what will occur next in their day. *Id.*, at 82. Each child has an individual work system which is designed to help the child become independent in carrying out his assignments. *Id.*, at 83. Within this work system are four questions for each child to integrate during his assignment: What am I supposed to do?; How long will the work last?; How do I know when I am finished?; and What comes next? *Id.*, at 84. The program uses visual cues as well as teacher directives. This increases independence and reduces frustration caused by an inability to understand auditory directives. *Id.*, at 89. Like Lovaas therapy, TEACCH allows the child to learn one task which has been broken into its simplest parts before going on to a more difficult task. *Id.*, at 98.

Another aspect of the program involves teaching language and communication skills because "[w]hat distinguishes children with autism from other language handicapped people is not so much the words, although a lot of kids have great difficulty learning words, it's using those words in a social context to communicate naturally, spontaneously, and meaningfully." *Id.*, at 106. This requires having the child learn and understand that communication involves two or more people since autistic children are self-contained. *Id.* The first goal is to get communication going in any form as long as there is a connection between the child and the teacher or peers. *Id.*, at 109. This requires an assessment of the child's current skills in order to know how to elicit spontaneous communication. *Id.*, at 111. Usually this is done by involving the child in an

activity which interests him, such as a picture exchange in which the child names the object. *Id.*, at 112–13. Dr. Marcus admitted that the TEACCH program is not the only manner in which autistic children may learn but noted that many of the same features of this program are used in others. *Id.*, at 120.

The TEACCH method does not use behavior modification to deal with behavior problems because that method is a consequential approach. *Id.*, at 121. Instead, it uses behavior management which means that, based on the child's individual needs, the environment is structured to prevent problems. *Id.* If the child, despite these measures, is exhibiting aggressive or self-injurious behavior, a new assessment is done. *Id.*, at 122. It may be that too much is being expected of the child or it may be necessary to use a consequential approach in close proximity to the behavior. *Id.* Many behavior problems in autistic children, as with normal children, are alternative forms of communication. *Id.*, at 123. They are signs of stress or frustration. *Id.* For example, rather than placing a child in a "time out" each time he kicks, he will be rewarded each time he does not kick. *Id.*, at 124. But at the root of the solution will be a determination of why the behavior occurs. *Id.*, at 125. Only in this manner can the need for the behavior be eliminated rather than simply suppressing the behavior itself. *Id.* Tantrums may occur because the child is frustrated at a task, the task has been going on too long, or it is too difficult. *Id.*, at 125–30. Although some people call it a form of task avoidance, one must understand why the child wants to avoid the task in order to understand the cause of the behavior. *Id.*

Dr. Marcus feels that TEACCH differs from Lovaas philosophically, strategically and in the manner in which success is measured. *Id.*, at 139. The Lovaas methodology views autism as a collection of aberrant behaviors which may be controlled by an intensive behavior/discrete trial teaching approach. *Id.*, at 140. TEACCH views each autistic child as having individual differences. *Id.*, at 142. "[W]hile you can improve on them and help and move people along in some cases to the point that they might be indistinguishable from normal, [TEACCH] doesn't really [ ] accept the notion that everything is fixable and that autism is merely a collection of unusual behavior or behaviors and deficits." *Id.* Moreover, TEACCH provides a predictable environment to enable the child to become independent by learning. *Id.*, at 145. The Lovaas approach uses the "one-to-one adult-initiated process and because of what autism is, and the fact that people with autism are potentially prompt dependent that what happens is that the person with autism becomes dependent on the adult who is doing the teaching." *Id.* They become dependent on verbal cues rather than learning to integrate cues by using their visual skills. *Id.* Lovaas also has a predesigned curriculum which is imposed on the child, rather than a curriculum designed for that specific child. *Id.*, at 147. However, TEACCH uses developmental psychology to ensure that the child "crawls before he walks" rather than teaching the child to walk when he does not understand the concept of crawling. *Id.*, at 151. Another difference between the two programs is the use in the Lovaas program of high school and college graduates as the therapists after they have been trained at the Lovaas Institute. *Id.*, at 154. "This is a very complex disorder, and people who are engaged in a clinical enterprise or an educational enterprise need to have good—they need to have a lot of knowledge in a lot of areas. And even then—even with that, you need specialized training and ongoing support." *Id.* It is also important that the learning occur in the classroom, as opposed to the child's home, because "[l]earning must go on in the context in which it can be generalized." *Id.*, at 158. One-on-one instruction is used in the TEACCH classroom but not to the exclusion of other methods of instruction. Many parents become con-

cerned that their child will develop inappropriate behavior from the other children in the class. *Id.*, at 179. However, autistic children have difficulty imitating behavior; therefore, if the child is at such a level of development that she is capable of imitation, there are other methods of working with her to avoid the problem. *Id.*, at 180.

## C. The program offered by the County.

The 1996–97 IEP would have placed CM, who was almost seven years old, in Ms. McDanel's classroom for autistic children at the Bruce Drysdale Elementary School. At that time, she had five students in her classroom, one girl and four boys ranging in age from six to eleven years. Transcript, Vol. X, at 18. Another child who is in a regular second grade classroom receives instruction from her one hour each day. *Id.* A third student who was taught by Ms. McDanel in two previous years is in a regular fifth grade classroom and goes to visit one hour each week as a reward. *Id.* One day each week, two fourth graders from a regular classroom come into her classroom as a means of reverse mainstreaming in order to teach socialization skills. *Id.*, at 19.

One of the students in her classroom goes to the library each morning where he uses the computer because he is learning to write sentences. *Id.*, at 42–43. Another student begins his day by doing independent work because it helps him settle into the routine. *Id.*, at 44. A third student is in the play area and a fourth is also doing independent work. *Id.*, at 45. Data is kept on each child and when the teacher and aides rotate, they discuss each child's accomplishments and goals. *Id.*, at 50. If a child's IEP requires it, a daily anecdotal log is kept and each child who is mainstreamed into a regular classroom has a daily log. *Id.*, at 54. Each child receives one-on-one instruction with Ms. McDanel each day. *Id.*, at 59. While the students work independently, they are monitored by an aide. *Id.*, at 64. Each morning the

children have time on the playground. *Id.*, at 69.

Ms. McDanel feels the environment of the room is important because autistic children are easily distracted. *Id.*, at 150. In addition to independent work time and one-on-one instruction, there are times allotted for communication and social skills development. *Id.* She finds an area of interest to each child and then begins to build a personal relationship with him based on that interest. *Id.*, at 151. This teaches them to communicate. *Id.* By having the classroom environment comforting to the children, they are able to adjust to the changes in their daily schedule, making the transition between tasks and different times of the day. *Id.* This allows them to transfer these skills beyond the classroom. *Id.*, at 152. Also, it frees them from fear and confusion and allows them to learn. *Id.*, at 152–53. Each week in the play area, they introduce different scenes, such as camping sites, to promote interest in the children. *Id.*, at 155. This encourages spontaneous communication. *Id.* If CM had come into the class, a third teacher's aid would have been hired. *Id.*, at 28, 115.

Ms. McDanel testified that tantrums are the beginning level of communication for autistic children and as soon as they have a system to communicate, the tantrums decrease. *Id.*, at 194. They are allowed to use pictures or other methods to communicate their needs and then the behavior usually ceases. *Id.* "I rarely have anybody tantrumming, because academically, they're learning." *Id.* Tantrums are a sign, not that the child is lazy, but that he or she is sick, hungry, tired, or frustrated. *Id.*, at 195. She has never had a child functioning well enough to be mainstreamed into a regular classroom who also is having tantrums. *Id.*

Ms. McDanel viewed a video of CM functioning in October 1996 in her private preschool. *Id.*, at 191. Based on her observations, the child was not functioning as independently as had been reported and she relied on her therapist for prompting.

*Id.*, at 192. CM was not functioning as well as any child in Ms. McDanel's classroom in areas such as learning the day of the week, knowing what was going on during the day and interacting with others. *Id.* She was unable to sit in a small group or work on something without prompting. *Id.* During calendar time, she required constant prompting to refocus and she did not respond to other children even when they approached her. *Id.*

Ms. McDanel was asked several questions about Dr. Blacher's reported observations of her classroom. Although Dr. Blacher reported several students engaged in self-stimulatory behavior, Ms. McDanel testified that only one student, who was absent that day, engages in such behavior. *Id.*, at 213. One student who was described as having been removed from the room due to behavior problems was actually doing an independent work project outside the class at the time. *Id.*, at 214. Dr. Blacher reported that no one checked or monitored the students doing independent work; a description with which Ms. McDanel disagreed. *Id.* Although Ms. McDanel had invited questions from the doctor concerning the observation, she had none. *Id.*, at 216.

Ms. McDanel explained the progress she has seen in her current students. T began in her classroom when he was five years old and at the time was very confused, had tantrums, and could not focus. Transcript, Vol. X, at 152–53. She began by using pictures to show him what would happen during each portion of the day. *Id.* When he first came into the class, he had almost no language skills. *Id.* After working with him, he began to answer "yes" and "no" to questions and then expanded his answers. *Id.*, at 154. The second year in her classroom, he began to have spontaneous communication. *Id.* "He's able to answer anything. He's able to participate in a group setting in a first grade classroom of 18 kids and listen and answer questions." *Id.* He understands the questions and gives appropriate answers, not as a result of having practiced with her, but as a result of conceptualizing the language. *Id.* T has learned to generalize and in his second year with Ms. McDanel is mainstreamed into the first grade classroom. *Id.*, at 35, 37.

M first began with Ms. McDanel in the 1996 school year and at the time was nonverbal. *Id.*, at 29. She did not understand the routine of the classroom but picture schedules were designed for her. *Id.* She is now able to express her wants and needs and for the first time is able to carry on conversations. *Id.* She is also able to follow the classroom schedule. *Id.*

B was originally labeled as learning disabled. *Id.*, at 158. He was evaluated at TEACCH and found to be autistic. *Id.*, at 159. He came into Ms. McDanel's classroom the previous year when he should have been in the fourth grade. *Id.* In March of that year, he began to move into a regular fourth grade classroom and this year, is in a regular fifth grade classroom. *Id.* Ms. McDanel feels that having a structured classroom allowed him to learn and become comfortable with oral instructions. *Id.* As a reward for his behavior in the regular classroom, he comes back to visit once each week for one hour. *Id.*

S is academically at his grade level but he remains in Ms. McDanel's classroom because he easily becomes distracted. *Id.*, at 45–46. Because of his level of anxiety, he performs well in the structured classroom but would have trouble coping in a regular classroom. *Id.*, at 46–47. However, he has made great progress because at first he had difficulty in the structured classroom. *Id.*

## IV. CONCLUSIONS OF LAW

ALJ Phipps found that "[a]t its core, the dispute between the parties is a debate over a choice of educational methodology for the teaching of autistic children." Final Decision, filed December 11, 1997. She found the County had complied with all procedural and substantive matters re-

quired by the IDEA and had offered CM a FAPE. She also found that in order for CM to receive maximum educational benefits, her one-on-one aide should be trained in the Lovaas method of using discrete trial teaching to assist in the transition to the regular classroom. Her findings were affirmed by the SRO. Decision, March 3, 1998.

At oral argument, Plaintiffs' counsel said the issue for resolution in this case is whether the County is obligated to reimburse the Plaintiffs because they did not adopt the Lovaas program for CM. Plaintiffs' trial brief is a recitation of the superiority of the Lovaas program over the TEACCH method. "This case provides the opportunity to address issues related to CM and simultaneously resolve a number of global special education issues that are of concern to the Defendant and the State of North Carolina." Plaintiffs' Trial Brief, filed August 12, 1999, at 8. At the heart of Plaintiffs' contentions is a belief that CM was denied the Lovaas program because it would have been too expensive. That, however, is not the issue at hand.[13] Plaintiffs raise only three legal arguments: the County failed to comply with the procedural requirements of the IDEA because the ALJ and SRO issued their opinions beyond the time requirements; the IEP is vague and ambiguous; and the Plaintiffs are entitled to reimbursement for an aide trained in Lovaas therapy who would have accompanied CM had she been in the regular kindergarten class for the 1996–97 school year.

Federal regulations require that within 45 days after receipt of a request for a due process hearing, the state agency must provide the hearing and issue a final decision. 34 C.F.R. § 300.512(a). When a request for a review of that decision is made, the SRO shall issue the decision within 30 days. 34 C.F.R. § 300.512(b). Extensions of time may be granted by the hearing or review officer on the request of either party. 34 C.F.R. § 300.512(c).

On September 23, 1996, Plaintiffs were on notice that the County's proposed IEP did not meet their requirements. They argue, however, that had ALJ Phipps' decision been timely rendered within 30 days after the conclusion of the hearing in April 1997, CM would have been able to take advantage of a public school education for the 1997–98 school year. The same argument is made concerning SRO Walters' decision. This position is based on the premise that the Plaintiffs would have accepted the IEP as proposed with the implementation of Judge Phipps' suggestion that the aide to accompany CM in the regular classroom would be trained in the Lovaas methodology.

First, the undersigned is unable to conclude from the record that the decisions were in fact issued in an untimely manner because the proceedings were extended by the conduct of both parties. On November 1, 1996, Plaintiffs filed a petition for a contested hearing pursuant to the North Carolina Administrative Procedures Act, N.C. Gen.Stat. §§ 150B–1, et seq.[14] Petition, included in Official Record. On that same date, Plaintiffs moved to

---

**13.** The trial brief raises such issues as: the County did not initiate the Lovaas program because then it would have had to provide it to other children; "Maybe in this case we are confronted with the belief that this problem should not fall on the school districts at all;" how should funding be provided for the Lovaas program; will the Court have the integrity to "serve its function of independently reviewing the case from a global perspective" since it "has already shown its ability to provide accolades for the TEACCH program;" this case should be the impetus for new legislation to support Lovaas in the state schools;

the TEACCH program results in a lifetime of disability; a decision in favor of CM will motive school districts to lobby the legislature to provide Lovaas programming; "How many lives need to be ruined while we deny the truth?" Plaintiffs' Trial Brief at 7, 11, 14.

**14.** The state act provides for different mechanisms and time periods than the federal regulations. Because the undersigned finds the Plaintiffs have not been prejudiced in any event, the issue of waiver is not addressed.

consolidate findings by Judge Mann with this petition and on November 14, 1996, that request was granted and the matter was continued. Order for Consolidation, filed November 14, 1996. A consent order was filed on December 2, 1996, which set the hearing for March 3, 1997. Response to Respondent's Motion to Continue, filed February 21, 1997. On February 14, 1997, the County moved for partial summary judgment which was granted on March 24, 1997. Order Granting Partial Summary Judgment, filed March 24, 1997. Plaintiffs moved for reconsideration and sanctions. Motions, filed March 11, 1997. In February 1997, the County moved for a continuance of the hearing which was granted and the hearing was scheduled to begin on March 17, 1997. Scheduling Order, filed March 14, 1997. The hearings began on March 17 and concluded on April 16, 1997. Thus, any argument by Plaintiffs that the hearing did not occur in a timely manner is defeated by the extensions of time given both by consent and on motion.

The transcripts from the lengthy hearing were not completed until July 30, 1997. Order, filed July 30, 1997. The parties were given, in accordance with the North Carolina Administrative Procedures Act, until September 19, 1997, to submit proposed findings of fact and conclusions of law. *Id.;* N.C. Gen.Stat. § 150B–36. On November 19, 1997, Judge Phipps notified the parties she had reached a decision and requested the County's attorneys to submit revised findings of fact and conclusions of law. Letter dated November 19, 1997 from Judge Phipps to counsel. The decision then issued on December 11, 1997.

Plaintiffs filed a request for review which was received in the office of the State Superintendent of Public Schools on December 20, 1997. Letter from E. Lowell Harris to Dr. Joe D. Walters, dated January 12, 1998. Dr. Joe Walters was appointed SRO on January 12, 1998. *Id.* On January 26, 1998, Dr. Walters notified the parties that the transcripts and records of the proceedings below had not yet

been received and therefore, "without waiting for a request from either of the parties, the Review Officer hereby extends the time for completion of the review." Request for Written Arguments and Extension of Time, dated January 26, 1998. Written arguments were to be filed on or before February 19, 1998. *Id.* Within 30 days of the submission of those arguments, the SRO issued his decision. Decision, filed March 3, 1998.

■ Assuming *arguendo* that the decisions were not issued in compliance with the federal regulations, the undersigned concludes the Plaintiffs are not entitled to relief. The Fourth Circuit has

> previously held that the failure to comply with IDEA's procedural requirements, such as the notice provision, can be a sufficient basis for holding that a government entity has failed to provide a free appropriate public education. However, to the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education.

*Gadsby by Gadsby v. Grasmick,* 109 F.3d 940, 956 (4th Cir.1997) (citing *Hall by Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir.1985)). Plaintiffs' contention is that if the decisions had issued earlier, "the inability to resolve the key issue of the aide should have precluded the break down that resulted in CM being unable to attend Defendant's school for the 1997/98 and subsequent school years." Trial Brief, at 16. However, the Plaintiffs admitted that the only program they would have accepted was the Lovaas program and that is not what the IEP provided. Contrary to the assertion in the brief, this was not the only reason the Plaintiffs rejected the IEP. They were adamant that CM should not spend any portion of the day in the autistic classroom. They did not agree that if CM was experiencing tantrums in the regular classroom she

should be returned to the TEACCH classroom until she had progressed sufficiently to handle the distraction of the regular class. And, they insisted that CM be instructed only by use of the discrete trial teaching method to the exclusion of TEACCH methods and receive such instruction 15 to 20 hours per week. Moreover, they insisted that her shadow in the regular classroom be the same person all the time which was contrary to the IEP's goal of having CM become less dependent on one person. Thus, whether they had known that ALJ Phipps would have recommended a Lovaas trained aide to be with CM while she was in the regular classroom is of no moment. They rejected not simply the lack of a Lovaas shadow but the fact that Ms. McDanel would have used TEACCH methods in a TEACCH classroom with one-on-one instruction which would occur for fewer hours per week than the Plaintiffs wanted. Thus, even if there were procedural violations, they did not actually interfere with CM's receiving a FAPE education. *Gadsby, supra.*

Plaintiffs argue the 1996–97 IEP was so vague and ambiguous that it violated IDEA's procedural requirements for the development of an educational plan. They claim it is impossible to ascertain where within the school the services would be provided, whether CM would be placed in a kindergarten or first grade class, who would be providing the services and at what times and places.

■ IDEA provides that an IEP means a written statement for the child developed at a meeting with the school officials and the parents which shall include a statement of the child's present levels of educational performance, a statement of annual goals and "a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs." 20 U.S.C. § 1401(a)(20). Here, the IEP specified that CM would receive 12.5 hours per week of one-on-one and guided instruction with 3 hours of speech services occurring in the TEACCH classroom. Respondent's Exhibit 10, at 1, 2, 5. It specified that she would be in a regular kindergarten class for library, music, art, lunch, assemblies, physical education, recess, centers, circles, free play and snack accompanied at all times by a teacher or aide and set forth the percentage of the time to be spent there. *Id.*, at 2. It was signed by both the TEACCH teacher, Ms. McDanel, and the kindergarten teacher, Michele Alexander. *Id.*, at 5. Throughout the discussion of goals for CM references are made to instruction in the regular classroom versus the TEACCH classroom. Moreover, during the meeting with the Plaintiffs on September 23, 1996, these matters were fully discussed and explained. *Brett Y., supra,* at *10–11 (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.1993) (IDEA requires "an adequate, rather than an optimal, IEP" and noting parents' agreement at IEP development meeting that the goals were appropriate)); *Doe By and Through Doe v. Defendant I*, 898 F.2d 1186, 1190–91 (6th Cir.1990) (where the information claimed to be absent from the IEP was known to all parties, technical violation harmless); *J.S.K. By and Through J.K. v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1571 (11th Cir.1991) (argument that IEP failed to include teacher's day-to-day activities and thus, ambiguous, rejected).

■ Plaintiffs' final contention is that they prevailed below because the ALJ and SRO determined that CM should be accompanied by a Lovaas trained aide while she was in the regular kindergarten class. As a result, they seek reimbursement for the cost of having their Lovaas therapist available to CM in her private school during the 1996–97 school year. However, reimbursement would be proper only if the County failed to offer CM a FAPE. *School Committee of Town of Burlington, Mass. v. Dept. of Educ.*, 471 U.S. 359, 372–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Sellers,*

141 F.3d at 526. Thus, the issue is not whether the Plaintiffs prevailed, but whether the 1996–97 IEP as offered would have provided a FAPE.[15]

It is first noted that both the ALJ and SRO found the IEP as drafted was appropriate.

[T]he IDEA[ ] recogni[zes] that federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment. Rather it establishes a "basic floor of opportunity" for every handicapped child. States must provide specialized instruction and related services "sufficient to confer some educational benefit upon the handicapped child," but the Act does not require "the furnishing of every special service necessary to maximize each handicapped child's potential."

*Hartmann,* 118 F.3d at 1001 (quoting *Rowley,* 458 U.S. at 199, 201, 102 S.Ct. 3034).

ALJ Phipps ruled that the proposed IEP for the 1996–97 school year "was appropriate; however, in order for the IEP to provide the maximum educational benefit to her" the aide should be trained in the Lovaas method. Decision, *supra.* This went beyond what was required under the statute. Nonetheless, the educational placement must be "likely to produce progress, not regression or trivial educational advance." *Hall by Hall,* 774 F.2d at 636.

The sequence of events occurring from the fall of 1995 through the spring of 1997 show that the County offered a FAPE. In fact, it may well be that the education offered by the County would have benefitted CM far more than continued Lovaas therapy. Contrary to the Plaintiffs' contention that placement of CM in the TEACCH classroom would have caused

her to regress, CM's behavior regressed from 1995 through 1997 while she was in Lovaas therapy. And, in the fall of 1996 she exhibited negative behaviors not previously shown, *i.e.,* biting and hair-pulling. In the spring of 1996, Ms. Dilworth reported to CM's mother they were in danger of being expelled from school because of CM's behavior. Yet, Plaintiffs failed to disclose this regression to any expert or to the County.

The County's experts and teachers noted the intensity of concentration of the Lovaas program on behavior modification and rote learning to the exclusion of developing spontaneous language skills. Ms. McDanel noted that when CM began to play and use spontaneous language during breaks, she was pulled back into therapy. She described CM as a child who was not enjoying herself. The Plaintiffs' experts admitted that at this point, CM no longer needed 40 hours per week of Lovaas therapy. Dr. Blacher said 40 hours was too much; CM should be in a classroom setting. Dr. Boyle recommended between 15 and 20 hours per week of one-on-one instruction, not specifying Lovaas therapy. Ms. Dilworth admitted that CM had become dependent on her and in the spring of 1997 had to be prompted repeatedly.

All of the experts testified that autistic children engage in inappropriate behavior as a means of communicating that something is wrong; *i.e.,* the child is tired, frustrated, sick, hungry, or having too much expected of her. CM's mother described her in the fall of 1996 as having become lazy and having forgotten what she had learned. During the same time, CM's behavior deteriorated. Ms. McDanel testified that autistic children do not engage in behavior problems because they are lazy but because something is wrong which they are unable to communicate. The behavior itself is the beginning of communication and the teacher must use pictures to help the child express herself. As soon as

**15.** The Court concludes that by raising this argument Plaintiffs have conceded that the IEP as modified by the use of a Lovaas trained aide would have provided a FAPE.

the child is able to communicate, the behavior improves. Yet three years into the program, CM's parents continued to enforce the Lovaas therapy which focused on behavior modification or "extinction" despite the fact that CM's behavior was regressing. What the Court is compelled to note is that by 1997 when she was seven years old, CM had been literally working approximately 40 hours per week since the age of three without any time to simply be a child. Her behavior regression is therefore, according to the experts, not surprising.

Plaintiffs strenuously objected to CM having any time in the autistic classroom out of fear she might learn inappropriate behavior. This argument is disingenuous in view of CM's deteriorating behavior during the same time frame. Moreover, it was to her detriment. Ms. Dilworth testified to numerous occasions when CM's classmates in the private school witnessed her tantrums, to the point that it impacted her socialization. On one occasion, CM tantrummed for ten minutes in front of her peers. The damage done to her self-image and ability to socialize by these incidents seems far greater than any experience she would have had in Ms. McDanel's classroom.

In addition, the Plaintiffs felt it essential that CM have an aide available to her at all times. This was a primary reason for rejecting the IEP because there was no guarantee that the same person would always be in the regular classroom with CM. Yet, Ms. Dilworth testified that she worked with other children at CM's private school. Indeed, the reason CM's classmates witnessed one of her tantrums was because Ms. Dilworth had been left in charge of the class and therefore could not leave to remove CM.

The County's teachers and experts testified that, first and foremost, autistic children need a structured environment in which they feel secure before learning is imposed on them. And, once this is accomplished, independence is the ultimate

goal so that the child can function in the real world. The IEP was designed to give CM the opportunity to do both: she would be in the structured classroom or a room adjacent thereto for academic one-on-one instruction and she would have time in a regular classroom with an aide for socialization and communication skills. Ms. Dilworth testified that by the spring of 1997, CM had to be removed from her private school classroom for any academic work to be accomplished. CM would not listen to stories read by her teacher; but when Ms. Dilworth read them, CM could answer questions. By all accounts, CM was not becoming independent but rather more dependent on her therapist.

Moreover, Dr. Boyle's testing in February 1997 showed that CM was not making the dramatic progress that her parents reported. Although her IQ scores increased some, her language and communication skills had not improved significantly and she still was unable to generalize that which she had learned. Dr. Boyle reported CM as having significant expressive and receptive language skills. He reported her as mildly retarded and depending on rote memorization rather than generalizing learning.

These findings corroborated those of the County's experts and teachers. Consistently, the school authorities could not find objective evidence of the progress which the Plaintiffs claimed on CM's behalf. The skills reported to have been mastered were not recognized by her private preschool teachers, individuals who had absolutely no stake in the litigation. And, the reports of Dr. Shea, Ms. Forst, and Ms. McDanel echoed Dr. Boyle's conclusion that CM remained unable to generalize the skills learned in therapy beyond that setting.

Yet while CM remained at Covenant Academy with a teacher her therapist described as below average, Ms. McDanel's children made progress in the TEACCH classroom. M went from being completely

nonverbal to having the ability to express her needs and wants. T was mainstreamed into the first grade and receiving one-on-one instruction. B had gone in less than a year from the TEACCH classroom into a regular classroom.

Of course, there is no evidence that CM would have prospered in the TEACCH setting because she has yet to be exposed to it. However, it is clear that the Plaintiffs have, understandably, acted with some sense of desperation in connection with their child's condition. After three months in the TEACCH program in 1993, they removed CM for the Lovaas therapy, a program described as achieving recovery before kindergarten. When CM was placed in a private preschool, no one was told she was autistic. Dr. Boyle was instructed to remove her IQ from his evaluation for the school. And, the Plaintiffs never told anyone evaluating CM that she was experiencing behavior problems. Nonetheless, the County did everything within reasonable limits to accommodate the Plaintiffs' desires for their child's education. In 1994, they offered to provide services in CM's private preschool. They provided speech services throughout free of charge. The Plaintiffs were reimbursed the sum of $1,200 in connection with Dr. Handleman's evaluation, a report which ultimately was useless. The County allowed the Plaintiffs to use Dr. Boyle's services instead of having certain tests readministered by the school authorities. Finally, in the third meeting for the 1996–97 school year, the County basically offered the Plaintiffs everything they had requested: CM would go into a regular classroom despite Ms. McDanel's misgiving that she could handle the size of the class. She would receive one-on-one and guided instruction for a total of 12.5 hours per week, a figure close to the 15 hours suggested by Dr. Boyle. Her speech services would be increased. And, an aide would accompany CM at all times while she was in the kindergarten class.

"The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education ...." *Lenn,* 998 F.2d at 1086. "The IDEA does not require, however, that a school system fund the best possible placement for a child. 'The [IDEA] requires only that the child be able to benefit from the instruction that [she] receives, not that [she] be able to maximize [her] potential commensurate with the opportunity provided nonhandicapped children.'" *Brett Y., supra,* at *14 (quoting *Denton,* 895 F.2d at 980). Nor does the IDEA create a cause of action for educational malpractice. *Sellers,* 141 F.3d at 527. The fact that the Lovaas program may be better than TEACCH or provide the maximum opportunity for CM's development does not mean that the IEP offered would not have provided a FAPE.

The undersigned finds the Plaintiffs have failed to carry their burden of establishing a violation of the IDEA. The preponderance of the evidence supports the findings of fact and conclusions of law of the ALJ and SRO.[16]

Plaintiffs also alleged a claim pursuant to N.C. Gen.Stat. § 115C–106(b) which provides in pertinent part that it is "policy of the State [ ] to provide a free appropriate publicly supported education to every child with special needs. The purpose of this Article is to ... bring State law, regulations and practice into conformity with relevant federal law." The language of the statute indicates that the standard for such an education should the same as the federal standard under the IDEA. However, "North Carolina apparently does require more than the [IDEA]. The special education program must pro-

---

16. The Court has considered arguments raised below but not addressed in the Plain-

tiffs' brief and finds the decisions below supported by a preponderance of the evidence.

vide the child with an equal opportunity to learn if that is reasonably possible, ensuring that the child has an opportunity to reach her full potential commensurate with the opportunity given other children." *Burke County,* 895 F.2d at 983. Nonetheless, this higher standard does not require a school district to develop a "utopian educational program" for the student with special needs any more so than would be required if the student were not handicapped. *Harrell v. Wilson County Schools,* 58 N.C.App. 260, 293 S.E.2d 687 (1982). To the extent reasonably possible, the student with special needs should be given an equal opportunity to learn. *Id.* For the reasons stated *infra,* the Court finds the decisions of the ALJ and SRO supported by a preponderance of the evidence and the Plaintiffs were offered an educational program which would have provided CM an equal opportunity to reach her full potential commensurate with the opportunity given other children.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that this action be dismissed by way of Judgment filed herewith.